CALDWELL v. WILLEY.

A VERDICT RESULTING FROM MISTAKE OR BIAS SHOULD BE SET ASIDE.— Appellee recovered a verdict and judgment against appellant for $3,345 damages for the latter's alleged failure to comply with his agreement to execute to appellee a five-years lease of a coal mine. The alleged contract and allegations concerning it, including appellant's

ownership of the mine, or authority to lease it, were denied by a
verified answer, and the answer was fully supported by the evidence.
The only witness who testified to the making of the alleged agreement
to lease was the plaintiff, his testimony being inconsistent with his
complaint, and improbable on its face. It being evident that the
verdict was the result of mistake or bias, it is within the rule which
requires such verdicts to be promptly set aside.

*Appeal from District Court of Fremont County.*

Mr. GEORGE C. NORRIS and Mr. R. H. GILMORE, for appellants.

Mr. JOHN G. TAYLOR and Mr. A. MACON, for appellees.

REED, C. This was an action brought by appellee to recover damages for a failure to execute and deliver a lease
to a certain coal mine in Fremont county. The issues were
made by cross-complaint and answer. In some former
litigation, which appears to have been between the Caldwell
Coal & Oil Company,— a corporation of which appellant
was president,— some other corporation, and appellee, the
nature and result of which are not disclosed in this record,
it appears a stipulation was filed under which an agreed
judgment was entered, and that by such document it was
agreed that this action should be prosecuted by the appellee against Caldwell individually. In making up abstracts
of records counsel unfortunately, frequently, well knowing
the premises themselves, forget that this court is not equally
well informed in regard to proceedings in the trial court,
and cause much labor and trouble by not stating full and
sufficient facts, and we are compelled to grope about, and,
by inference from the meager facts stated, to arrive at some
conclusion in the premises.

The case in some respects is quite peculiar. The allegations in the cross-complaint are that on June 15, 1884, Elder,
Jones, Delano, Cole and appellant were the owners in fee
and *in possession* of certain lands, and that they, "desiring
to have the same prospected for coal, agreed with appellee
that he [appellee] should explore for coal, and, in case of dis-

covery of a vein, said Elder, Jones, Cole, Delano and Cald-well, for certain considerations, which included payment of royalties, * * * should and would execute to him (Willey) their certain lease and demise in writing of the whole of said premises for a term of five years," etc. "That in and about the making of the said agreement with appellee, the said Elder, Jones, Cole and Delano were represented by the said Caldwell, who, in making the said agreement, acted and agreed for and on behalf not only of him, the said Cald-well, but of the said Elder, Jones, Cole and Delano; and that Caldwell was * * * authorized so to agree" for the others. This is the only agreement alleged,— a joint agreement of all the owners; the consideration moving them being to have "the land prospected for coal." It is also alleged that, after the agreement was made, Elder, Jones, Cole and Delano were fully informed, and ratified it, and permitted him to go to work upon the land; that, relying upon the agreement, appellee entered into posses-sion, expended large sums of money, and on his part com-plied fully therewith; that Caldwell, Jones, Cole and Delano delayed and finally refused to execute a lease, and that ap-pellee sustained great damage; prays that all the last-named parties be made defendants, for a decree compelling a lease, for an injunction, damages, etc. The complaint was veri-fied by appellee.

There was no joint answer, and neither Elder, Cole, Jones nor Delano answered. Appellant answered individually, denying that he, individually or in connection with others, at any time made an agreement to lease the land or the mine for five years, or any other time; denied that at any time before November 21, 1884, he was the owner of any part of or had any interest in the land; denied that he desired to have the land prospected for coal, or that he, individually or in connection with others, entered into an agreement with appellee to explore the land for coal; de-nied that he, for himself or in connection with others, was to execute any lease whatever; denied that he ever repre-

sented Elder, Jones, Cole and Delano, or either of them, in any agreement with appellee as agent; admitted that on June 15, 1884, he was in possession of the premises, but alleged it to have been under a lease from the owners, that expired on the 15th of November, 1884; admitted that appellee mined and took coal from a vein on the premises, but denied that it was under any agreement with him, or with his authority, etc. The answer was verified.

It is evident that there is not a full transcript of the cross-complaint in this record. It appears inferentially that certain corporations were made co-defendants. Who they were, and for what purposes joined, we are not informed. It is stated that "the corporations answered the cross-complaint, but no issue concerning them was tried." The answers of the corporations are not given.

The trial was to a jury, resulting in a verdict for appellee for $3,345, and a judgment upon the verdict.

It appears to have been conceded, or at least not disputed, that at the time of the alleged making of the agreement appellant owned no interest in the property, and that he first acquired an interest in November following. It is also conceded, or not disputed, that at the date of the alleged agreement for a lease neither appellant nor the corporation of which he was president had any interest in the property, except a lease from the owners, expiring on November 15th of the same year; and that at the expiration of such lease the owners went into possession, and retained it until January 1, 1885, when a new lease was made to appellant for one year.

Numerous errors are assigned, many of which it will not be necessary to discuss. It is urged that the damages allowed were excessive. Nearly all of the evidence in the record upon the question of damage was that of appellee. Apparently no effort at reduction was made by appellant. If the finding upon the other issues was correct, and can be sustained, the assessment must stand. The amount was warranted by the evidence, and seems reasonably moderate

under the proof. A party cannot let such questions go by
default upon the trial, and urge them here, when the only
question is as to the amount awarded, and the verdict does
not exceed the proof.

Upon the trial there was no evidence introduced nor at-
tempt made to establish a joint agreement by the owners
to make a lease, nor of any desire to have the land explored
or prospected for coal, which was alleged as the incentive
or consideration for the supposed promise. It was shown
and conceded that Caldwell was not an owner; that he was
in possession under a lease from the owners; consequently,
that the owners had no control of the property for the pur-
poses supposed at the time, nor the possession of the prop-
erty as alleged in the cross-complaint. No effort was made
to in any way connect the owners with the transaction. No
proof was made or attempted in support of the allegation
that Caldwell acted as the agent of the owners; and, al-
though the only agreement alleged was a joint one, where
all the owners were parties, appellee (Willey) testified to an
agreement with Caldwell alone, stating in his evidence that
he supposed him (Caldwell) to be the sole owner of the
three thousand acres of land, and that he never knew that
he was not the sole owner until November 15, 1884.

The testimony is very voluminous and contradictory.
The only person testifying directly and positively to a con-
tract for a lease for five years is the appellee. J. C. Ban-
semer's testimony was taken on behalf of appellee. He
says that Willey entered upon the land, and commenced
opening the mine, July 8, 1884, "by permission, and with
the expectation of getting a lease from Caldwell. I became
interested with Willey, holding one-half interest; I furnish-
ing what cash means were needed and credit to buy other
materials. * * * After the expiration of the Caldwell
Coal & Oil Company's lease, November 15, 1884, Willey
desired me to get a lease from Mr. Jones, who represented
the largest portion of the property." In answer to an in-
terrogatory he says: "Mr. Willey stated that he had no

doubt that he could get a lease, but that it always ended in failure. Twice he represented that he had a lease from Caldwell, but was never able to produce it." In answer to the interrogatory: "Did you ever purchase from Mr. Willey his claim or interest in the Willey mine, and, if so, when?" he said: "Mr. Willey sold me his entire interest in the mine April 21, 1885, with the positive assurance that I should have a lease." This assignment was in writing, and was put in evidence as Exhibit A. In answer to the interrogatory: "Did you ever have any conversation with Mr. Caldwell on the subject of the five-years lease?" he said: "Yes; during the first week in July, 1884. Question. In that conversation, did you ascertain from Mr. Caldwell that he had agreed with Willey to give you and Willey a five-years lease upon the coal vein? Answer. Mr. Caldwell left me under that impression." On redirect examination he was asked: "Did Mr. Caldwell ever tell you himself that he would give Mr. Willey a five-years lease, or did he state that fact to Mr. Willey, and did Mr. Willey report it to you? A. He did not tell me personally, but told Willey, and Willey reported it to me." The witness further testified that in November or the first of December, 1884, he knew Caldwell's lease had expired; that at the request of Willey he went to see Jones, to secure a lease from the owners; and that several times Jones promised them a lease. This rather equivocal and uncertain testimony of Bansemer's is all the testimony supporting Willey.

Caldwell positively and directly denies that he ever agreed with Willey to make a lease for five years; states that it would have been impossible for him to have done so — *First*, for the reason that he was not an owner of any share of the property at the time the alleged promise was made; *second*, that all the control he had of the property, or interest in it, was that of the Caldwell Coal & Oil Company, which was a lease to expire in four or five months. Caldwell's testimony is sustained by that of Mr. Jones, one of the largest owners of the property. He testified that in

July, 1884, Willey had a conversation with him. "He said * * * he had got permission to mine on section 18 until the expiration of Caldwell's lease, which expired the 15th of November, 1884;" and on cross-examination, when asked in regard to Willey's knowledge of the time that Caldwell's lease expired, said: "He did not know, for I told Willey — so had Caldwell — how long Caldwell's lease was to run. Question. When did you tell him this? Answer. Previous to the time he commenced work on section 18 he was there working by the day at what was called the 'Canfield' mine."

On November 15, 1884, the Caldwell lease expired, and possession was taken by the owners. Willey, by license or permission of the owners, continued to mine until January 1, 1885, paying royalty to Mr. Jones. At that time a new lease was made by the owners to Caldwell for one year. Mr. Jones says: "After the lease was made to Caldwell, I told Willey that he must stop mining coal there, but that he could go to Caldwell and see if he could get Mr. Caldwell's consent to mine coal. Mr. Willey said he would go to Caldwell about it. Question. Did Willey claim at that time that he was there under a lease or promise of a lease from Caldwell? Answer. No; he said that he wanted to get a lease from Caldwell." Willey had paid Caldwell no royalty whatever for the coal taken out between the time of his entry and the expiration of the lease on the 15th of November, previous. It is shown that Willey went to Caldwell to get a lease after Caldwell got the new lease from January, 1885, to January, 1886; and Mr. Jones further says: "I was in Caldwell's office about March, 1885, and Caldwell read a memorandum to Willey. Willey wanted to get a lease but did not pay the royalty. Caldwell insisted it should be paid; not only all back royalty, but for all coal he should mine in the future. Willey said he would see Caldwell again." He further testified that the memorandum for a lease made by Caldwell to Willey was to expire December 31, 1885, and that Willey made no objec-

tion to the time mentioned. "I never heard of a five-years lease until a short time before this suit was commenced."

C. P. Elder, one of the owners, testified, in answer to the question whether he had ever had any conversation with Willey regarding a lease: "I had several conversations with him in my room; also in George C. Norris' room; and he made certain statements in which he said Mr. Jones had given him a lease, and that Mr. Caldwell had given him a lease, etc. Afterwards Mr. Jones and Mr. Caldwell met him in my room, and together they said that they had never made such a lease. Mr. Willey was present when the statement was made, and that they had never made or promised a lease. When this statement was made Mr. Willey did not contradict it. This was during a conversation with Willey, and he heard it."

Although the former owners of the land and the Caldwell Coal & Oil Company were by stipulation dropped out of the litigation, and it was continued against appellant alone, an examination of the entire evidence shows that whatever was done or attempted by Caldwell, if not done on behalf of the corporation of which he was president, was done through and by advising with or with the co-operation of Mr. Norris, the secretary of the corporation. Mr. Norris testified that on the 8th or 9th of July, 1884, he was at the office on Coal creek, and Mr. Caldwell showed him a statement or proposition for a lease to Willey for five years in the handwriting of Mr. Bansemer, that Caldwell said Willey had left there the night before. It appears the matter was by Caldwell submitted to Norris for his action or consideration, and he testified: "Immediately after, I went over to see Mr. Willey. His house was probably twenty rods from the office. Before I arrived at the house, he, being in the yard, came to meet me. I spoke to Mr. Willey about the memorandum he had left at the office for the lease. I at once said to Mr. Willey that it was impossible to think of such a lease as that, because we only had an option on the property that would

only run about four months from that time, or ending the 15th of November, 1884; and, while we expected to take the property, yet we could not execute a lease for longer than that time under any circumstances. Neither would I advise him to take a lease for any length of time, on account of the uncertainty. Mr. Willey said he was not particular about that; that that was written by Mr. Bansemer, and he had put in five years, but he was willing to take it for any length of time, but he did not like to take it for a short time, because it would be necessary for him to get some other parties to furnish him the money. I told him that was a matter he must decide himself, but it was utterly impossible for us to execute a lease longer than the 15th of November, 1884. Question. Was there anything said at that time to Mr. Willey about a promise? Answer. He said nothing whatever about a promise being made. * * * I then said to Mr. Willey that I would draw up for him a permit, if he wished something in writing, to go on and mine coal up to the time our lease expired,— the 15th of November, 1884. I immediately went over to the office, and drew up a rough sketch of a license or permit for him to mine, and handed it to Willey [which he identifies as the one in evidence]. I told him that was the utmost that we could do. He then said he was satisfied with that, but he wished to send it to Mr. Bansemer. * * * He told me he was perfectly satisfied with this, but said he would have to submit it to Mr. Bansemer; and, whether Mr. Bansemer agreed to it or not, he would execute it when it came back. I then and there distinctly told Mr. Willey I would not advise him to do anything whatever with this property; it was so short a time; and it would be foolish for him to go on and go to any expense mining coal under this agreement. He said he could get coal almost from the surface, and the expense of opening the mine would be very small, and that he was willing to take the risk."

The testimony of John S. Palmer in regard to conversa-

tions had by him with Willey also sustains the other evidence given on the part of the appellant. It is clear that the only written instrument given appellee was the unsigned draft of the license or permit drawn and delivered by Norris. It also appears from the testimony of appellee, as well as that of others, that during the occupation of the mine by Willey he was in treaty with the Denver & Rio Grande Railway Company, or with some of its officers, to secure a side-track and switches at the coal-bank, to facilitate shipping; and on October 19, 1884, he wrote the following letter, which was in evidence and marked "Exhibit C:" "Coal Creek, Colo., 10–19–1884. Mr. Caldwell & Norris — Dr. Sirs: Sence my return from Denver i have Bin thinking what is Best to do when Mr. Danforth loms up here and wants to see my contrack Before contracking with me for my coal. Don't you think it will Bee Best for you to Draw up a Bogus Contrack and send it to me, with the understanding that i will return the same to you after the D. & R. g. Puts a Switch in at the mine; if i show the one i have got they want do Enny thing, you Bet. Please let me here from you at once what is Best to do. the miners all hot yet. yours Respectfully, H. WILLEY."

In this there is no assertion of any promise to him by Caldwell to make and execute a *bona fide* contract of lease, and asking a fulfillment of a promise, no complaint that it has not been done, but a tacit admission that the unsigned draft of a license was the document under which he held, and his authority for mining. He says, if he shows the authority he has, the railroad company will do nothing; and with an exhibition of moral obliquity that should discredit him in any court, he asks that a "bogus" contract of lease be sent to him, by which he can impose upon the railroad company, and afterwards return it. It is unnecessary to comment upon Willey's testimony, or his want of moral integrity, as evinced by his own evidence and in his correspondence. It is sufficient to say that his testimony is not only not supported by that of any other witness, but is

overwhelmingly contradicted and overthrown by that of several others. The letter above given, when identified and admitted in evidence, was alone sufficient to render his entire evidence insufficient if it had been uncontradicted.

Leaving out of consideration the fact that there is no evidence whatever to sustain the allegations of the cross-complaint, as before shown, and the fact of the assignment of Willey to Bansemer of all his interest by a writing of April 21, 1885, which should have precluded him, if he had had a lease, from claiming damage after that date, and basing our conclusion only on the ground of a want of evidence to sustain the verdict, we think the judgment should be reversed. On examination, it is obvious that the verdict was the result of mistake and misapprehension, or of bias and prejudice. It was certainly unwarranted, and should have been set aside. This court, like others of last resort, is loth to interfere with findings of fact by a jury, and has in several instances carried the rule of non-interference to the fullest extent allowable; but where, as in this case, the verdict is clearly the result of misapprehension or bias, there should be no hesitation in setting it aside. We find no error in the instructions of which appellant can complain. That they were not properly considered and followed by the jury is apparent.

We advise that the judgment be reversed and the cause remanded.

BISSELL and RICHMOND, CC., concur.

PER CURIAM. For the reasons stated in the foregoing opinion the judgment is reversed.

*Reversed.*