[No. 6386.]

BAIRD v. BAIRD ET AL.

1. **Equity Pleading—Laches**—One who applies to a court of equity after an unreasonable lapse of time succeeding the accrual of his right, must set forth in his bill with particularity the impediments to an earlier application.—(508)

2. **Evidence — Parol — Admissible,** to show a deed absolute of lands to be a mortgage (Code § 261); but the evidence must exclude all reasonable doubt.—(509) .

The evidence examined and held insufficient to meet the requirements of the rule.—(517)

3. **Conveyance of Land, with Contemporaneous Bond to Reconvey,** is sometimes accepted as strong evidence that a mortgage is intended; but where it appears that an absolute transfer was the purpose of the parties, this intention prevails.—(516)

4. Contracts—Construction—Conduct of Parties—The construction placed upon a contract by the parties thereto in the performance thereof, before controversy has arisen, is one of the best evidences of the intent of the contract.—(518)

5. Appeals—Finding on Insufficient Evidence—A decree entirely unsupported by the proofs will be reversed.—(520)

*Appeal from El Paso District Court*—Hon. W. S. Morris, Judge.

Mr. Frank J. Baker and Mr. P. M. Kistler for appellants.

Messrs. Van Atta & Dolph for appellees.

Mr. Justice Hill delivered the opinion of the court:

The complaint in this case avers that the absolute deed given by William J. Baird to Gustavus J. Baird for a one-half interest in a certain farm in El Paso County, together with a half interest in certain lots in Colorado City, at the time of its execution (September 11, 1877) constituted a mortgage. The appellant is the devisee of Gustavus J. Baird; the appellees are heirs of William J. Baird. The two Bairds were brothers. No bad faith is averred on the part of the appellant or her predecessor in interest, in procuring the conveyance, but counsel for appellees rely entirely upon the view that the transaction constituted a mortgage, and that appellees (plaintiffs below), as the heirs of William J. Baird, since deceased, may assert a right to the reconveyance of the property upon payment of the mortgage debt with interest to include an accounting of rents, profits, etc. If their major premise be correct, their conclusion correctly follows, unless the remedy is barred by limitation, or for some other reason cannot be enforced.

There is a question concerning the sufficiency of the complaint as to whether the appellees are not

estopped from asserting the claim at this late date upon the grounds of negligence under the doctrine of laches and stale demand, by reason of the absence in the complaint of any allegation in any manner attempting to excuse the laches of William J. Baird during his lifetime and those of the appellees thereafter. The complaint was not filed until about twenty-nine years after the execution of the instruments, and twenty-four years after open, notorious, adverse and continuous possession was taken and asserted by Gustavus Baird, and, after his death, by this appellant. The authorities seem to be uniform in holding that courts of equity will only grant relief in case the application therefor is made without unreasonable delay, and the rule is that the claimant should set forth in the bill specifically what were the impediments to an earlier prosecution of the claim, and how he or she came to be so long ignorant of his or her alleged rights, and the means used by the respondent to keep him or her in ignorance, and how he or she first came to the knowledge of his or her rights. This question was thoroughly discussed in the case of *Godden v. Kimmell,* 99 U. S., p. 210, where the foregoing doctrine was quoted and recognized as the universal rule. The same doctrine appears to have been recognized in this jurisdiction. —*De Mares v. Gilpin,* 15 Colo. 76; *Graff v. Town Co.,* 12 Col. App. 106; *Hagerman v. Bates,* 5 Col. App. 391; *Great West Min. Co. v. Woodmas of Alston Min. Co.,* 14 Colo. 90.

Whether this rule is applicable where a deed is to be declared a mortgage, is not necessary to determine, for, without passing upon this question, we shall assume that the mortgage issue is sufficiently presented by the pleadings, and proceed to consider whether the evidence sustains appellees' theory. The equitable rule that an absolute deed may be

shown by parol to be in effect a mortgage, has, in this state, received express legislative recognition. —Civil Code, sec. 261. But it should be observed that, to establish this fact, the proof must be clear, certain, satisfactory, unequivocal, trustworthy, convincing and, some cases say, conclusive; in short, as stated in some former decisions of this court, the case must be made out with that fullness and precision which is essential to a conviction in a criminal case—beyond a reasonable doubt.—*Whitsett v. Kershow*, 4 Colo. 419; *Graff v. Town Co.*, 12 Col. App. 106; *Townsend v. Petersen*, 12 Colo. 491; *Armor v. Spalding*, 14 Colo. 302; *Perot v. Cooper*, 17 Colo. 80; *Davis v. Hopkins*, 18 Colo. 153; *Butsch v. Smith*, 40 Colo. 64; *Enos v. Anderson*, 40 Colo. 395.

Appellees have engaged in a difficult undertaking. They are to prove a parol defeasance agreement, made over twenty-eight years prior to the commencement of the suit, by and with the ancestors of the parties who died about eleven years prior to the bringing of this action.

It appears, for some years prior to September 11, 1877, the two brothers were equal owners of the ranch in controversy, situate in El Paso County; William was in possession of the property, and had been for some time; Gustavus lived in the East, and advanced to William certain moneys used in the purchase of William's interest in the property, and for other purposes. Conditions ran along in this manner until Gustavus came out, when they had a settlement, by which it was shown that William was indebted to his brother Gustavus in the sum of $1,200.-00. Whether this amount was made up of sums previously advanced to William by Gustavus, or in part paid by Gustavus to parties who, at the time, held incumbrances against the half interest of William, or otherwise, is not quite clear. It is consistent

to assume it was both. In any event, that amount was then due and its payment urged by Gustavus. The testimony concerning this settlement was given by Mrs. R. L. Cone, a sister of the brothers, who was present when it was made, and stated:

"  *  *  *  When they finished their settlement, *  *  *  Gustavus wanted him (William) to settle it all up, and he could not do it without borrowing the money, and he did not know where he could get it at that time; and Brother Gustavus made some objections to a trust deed on account of it calling him out here again, and it would be expensive to him, providing he had to foreclose it. I cannot say which one proposed the deed; but giving a deed and a bond for a deed was proposed at that time, and it was given. Each of them owned an undivided half interest in this land. Gustavus had put in money into the property, and William had put in money, time and labor, and that is what they settled on."

It appears that, contemporaneous with the execution of the deed, Gustavus gave to William a bond for a deed which called for a conveyance of this one-half interest from Gustavus to William, upon the payment by William to Gustavus of $1,200.00, five years from date, with interest at the rate of ten per cent. per annum, to be paid yearly. The bond states that William J. Baird has given his promissory note for said amount. It further provides that, if the said William shall forfeit his claim to said deed, then all sums paid on said note more than the amount of said interest shall be refunded, provided said note cannot be enforced, with the other usual covenants in a bond of that kind. These instruments were properly recorded at that time. Mrs. Cone testifies that she does not know whether Gustavus took a note for the $1,200.00 or not. Appellees failed to show that $1,200.00 was not a reasonable value of the one-half

interest of the ranch at that time.   The evidence, if it tends to show anything upon the subject, goes to establish that twenty-four or twenty-five hundred dollars was a reasonable value of the entire ranch property.   The deed and bond for deed included a half interest in some lots at Colorado City (the exact value of which is not shown), but, from the correspondence, their then total value was probably about $300.00.

William continued in possession of the ranch property until some time after the expiration of the five-year period named in the bond for deed, when it appears he had not paid any of the principal, and only $80.00 of the interest called for by the bond. Gustavus, about 1883, upon account of such non-payment, took possession of the entire ranch; made some improvements; paid the taxes in his own name; had agents rent it for him, and applied all the proceeds to his own use, and, in all respects, assumed entire ownership as his own, and continued to retain possession from that time until the time of his death, also that of his brother, which occurred about a week apart, during the year 1896.   After the death of Gustavus similar possession, claim of ownership, etc., was continued by appellant up to the time of trial.   Possession was given Gustavus voluntarily by his brother William, who thereafter wrote him from Colorado Springs in February, 1884, in which letter, referring to this ranch, he states:

"I suppose my interest in the ranch is forfeited. I think perhaps by another year I could have paid for it, but it is hard to tell.   I believe you said if I did not pay for it, that you would pay me back what I paid you when you were here.   I think the ranch could be sold for a fair price if you had a man hold of it that was not more inclined to tell the disadvantages of it than the advantages, but what-

ever you do, do not sell any water; if you do you will never sell the place; the old ditches has the water when scarce, and new ones has to go dry.''

On May 23, 1886, at Colorado Springs, William again wrote his brother Gustavus in the East. The material part concerning this controversy was as follows:

''I will go back to my last letter. I wished then to know what you intended to do about what I paid in on the place. You agreed to pay me back all that I paid in on the place when you were here if I failed to pay for the place. The old town lots I sold you one-half of for one hundred and fifty dollars which was turned on the place; the other half I had no business giving you a deed for, but you thought it would be better as I was in debt some and might lose them. To all appearance I have lost them, the twenty-three acres, if you would put that in you would buy the forty to square up the place, guess you bought it and have got it. The ditch I put in I could have sold for five hundred dollars. Then there was the colt and heifers, but you have it all in your own hands to do as you please.''

On February 17, 1890, at Colorado Springs, William again wrote his brother Gustavus in the East. The material part concerning this transaction was as follows:

''I think of going into the real estate business this spring, and if you want any lots sold, I would like to sell them for you, also the ranch. There is a little excitement on ranches now, but it will not last long. If you will put your figures on the ranch, I think I can sell it for you for cash if you do not get them too high, and the money would bring you in more than the ranch. I have a party in view here if I can find out right away before he buys somewhere else. Now, if you will sell, put your figures

so as to give me a chance to make a dollar or two myself, as you have got it all I think you can afford to give me a little show but give me your figures right away."

Again, on August 28, 1890, in another letter, the following appears:

"I have worked hard this summer to sell some of your property for you, and have at last succeeded in selling the ranch for nine thousand dollars. You can deposit the deed in the bank or with me, which ever you like, and will get your money the fifteenth of next month unless you wish to leave a part of it on the place at seven per cent. If you do, write me that you will leave, stating the amount at eight per cent., and if you will take the seven, put it on an extra piece of paper so I can show them your letter and I think I can get the eight per cent., but you can have all the money if you wish it.  *  *  * You have the taxes to pay and hold the place until the first of March. ` *  *  * I shall expect my four per cent., and as much more as you are a mind to give me."

Mrs. Cone testified that William never made any claim to Gustavus during the years from 1877 to 1896 (up to the time of his death) that he had any interest or claim to the land; but that he did tell her he claimed an interest in it, but did not state what that interest was. She further testified:

"At the time the deed and bond for a deed was given, in that deed were a certain number of lots in Colorado City, * * * and while it was not brought into the writings, as some of us thought he was getting too big security and made some remarks—he (Gustavus) said: 'I will agree to this if I have to take the ranch, I will deed back the town lots to William.' "

It was further shown in evidence that, about

(33)

1889, he deeded these lots to Emma Baird, the wife of William, instead of to William, but that this was done at William's request; also that he repaid to William the $80.00 which had been paid him upon the bond for deed. She also testified that Gustavus did not take possession of the ranch until a year or two, perhaps more, after the maturity of the note. She stated she knew he (Gustavus) was trying to get his money; he did not want to take charge of the place; he was trying to get the interest or something of that kind, and he waited as long as he could.

This is all the evidence we have been able to gather from the record favorable to the claim of the appellees. The letters of Gustavus to William in reply to those herein referred to, when offered, were rejected. Whether this was error or not is unnecessary to determine. The other facts are all inconsistent with the contention of the appellees.

The consideration named in the deed and bond for a deed were about the then value of the half interest in the ranch. We take it that the very statement of Gustavus, made at the time, as testified to by his sister, that he objected to taking a trust deed, 'for the reason that it would require him to come to Colorado and be at the expense of a foreclosure sale, shows an intention upon his part to make only a straight purchase of the property, and that it was intended by him, at that time, that the instruments should speak for themselves. The bond for deed provided therein the right for William to repurchase the property at a certain price, including interest; and, as stated by the Supreme Court of the United States, in the case of *Conway's Executors v. Alexander,* 2 Curtis 518, speaking through Chief Justice Marshall:

"To deny the power of two individuals, capable of acting for themselves, to make a contract for the

purchase and sale of lands defeasible by the payment
of money at a future day, or, in other words, to make
a sale with a reservation to the vendor of a right to
repurchase the same land at a fixed price and at a
specified time, would be to transfer to the court of
chancery, in a considerable degree, the guardianship
of adults as well as of infants. Such contracts are
certainly not prohibited either by the letter or the
policy of the law.''

The brother, Gustavus, was not a lender of
money; his brother was owing him this amount upon
a settlement; he not being in the practice of lending
money, is certainly an argument against his intend-
ing this transaction as a loan, and his statement, at
the time, furnishes strong reasons for the opinion
that Gustavus Baird himself did not so understand
it. In this view of the case, the proposition of giving
a deed and his refusal to accept a deed of trust, are
entitled to great consideration. The argument that
the bond for deed calls for the same consideration
as that in the deed, is not significant. The language
in a somewhat similar case, that of *Cowell v. Craig*,
79 Fed., at page 688, on this subject, can be appli-
cably quoted here:

''I am unable to understand what significance
there is in that fact, standing alone. The considera-
tion of the deed was $5,000.00. The amount that was
to be paid on the repurchase was, therefore, neces-
sarily, the same sum of $5,000.00. That was the
amount of the transaction. That is all that can be
said, unless we should assume that Mr. Cowell had
gone into this transaction for the purpose of making
money by the purchase of the property, by its resale
three years after. But I do not understand Mr.
Cowell had in view any profit on the advance of the
real estate. It was a purchase by him for $5,000.00.
He appears to have believed that that amount was

about the value of the property, and that it would be sold probably for that amount at any time within three years, and he gave Mr. Craig the option of buying it back at that price. Meantime, Craig would have to pay the rent at $50.00 a month, which would be the equivalent of 1 per cent. interest on $5,000.00.''

In the case at bar, the parties were brothers; by the purchase, Gustavus, no doubt, had in mind the assistance of his brother by giving him the right to repurchase within a certain period; in the meantime, he was to have the interest upon his money, and the remark testified to by his sister, we think significant as bearing on the transaction, namely, that he objected to a deed of trust because it would require his return to Colorado, in case he was compelled to foreclose, which shows that phase of the transaction was discussed and objected to by him; while, by purchasing the property outright, he could then give his brother the right to repurchase under certain conditions and, in case he did not do so, then nothing further need be done. This course appears to have been followed, as shown by the papers executed, and to thereafter have been so considered and acted upon by the parties to them.

It is true, as laid down in some cases, that contracts for repurchase, made contemporaneously with conveyances of real estate absolute in form, are sometimes strong evidence tending to show the conveyances are intended to be mortgages, but where it appears the parties intended an absolute sale and a contract allowing the vendor to repurchase, such intention must prevail.—*Hanford v. Blessing*, 80 Ill. 188; *Cowell v. Craig*, 79 Fed. 685.

As stated in the case of *Henley v. Hotaling*, 41 Cal., at page 27:

''There can be no question that a party may make a purchase of lands either in satisfaction of a

precedent debt or for a consideration then paid, and may at the same time contract to reconvey the lands upon the payment of a certain sum, without any intention on the part of either party that the transaction should be, in effect, a mortgage. There is no absolute rule that the covenant to reconvey shall be regarded, either in law or equity, as a defeasance. The covenant to reconvey, it is true, may be one fact, taken in connection with other facts, going to show that the parties really intended the deed to operate as a mortgage; but standing alone it is not sufficient to work that result. The owner of the lands may be willing to sell at the price agreed upon, and the purchaser may also be willing to give his vendor the right to repurchase upon specified terms; and if such appears to be the intention of the parties, it is not the duty of the court to attribute to them a different intention. Such a contract is not opposed to public policy, nor is it in any sense illegal; and courts would depart from the line of their duties should they, in disregard of the real intention of the parties, declare it to be a mortgage.''

When we consider the evidence in this case, under the most favorable view that can be taken, it fails to come up to the requirements. It will be noted that no witness has testified that it was the intention of the original parties that this deed was to be considered as a mortgage, and we are unable to ascertain how it can be gathered from the facts. While the other circumstances bearing strongly upon this point furnish intrinsic evidence of the improbability of such fact, and the testimony is too uncertain and conflicting to prevail against the strong proof of intending a sale and purchase, as shown by the deed itself. Another very potent reason why these instruments should not be disturbed grows out of the actions of the parties to them during their lifetime,

as quoted with approval from a Federal case by this court in the case of *Lovell v. Goss,* 45 Colo., page 312:

"The practical interpretation given to their contracts by the parties to them while they are engaged in their performance, and before any controversy has arisen concerning them, is one of the best indications of their true intent, and courts that adopt and enforce such a construction are not likely to commit serious error."

The statement in the letter of February, 1884, in which he (William) states: "I suppose my interest in the ranch is forfeited. I think perhaps by another year I could have paid for it. * * * I believe you said if I did not pay for it that you would pay me back what I paid you when you were here," in our opinion, is more consistent with his claim of an interest therein by his agreement to purchase under the bond for deed than by any claim that it was agreed the original deed should be a mortgage. This view is further borne out by the last portion above quoted wherein he states: "I believe you said if I did not pay for it, that you would pay me back what I paid you when you were here." This refers to the $80.00 paid upon the bond or note given with it, if one was ever given, and tends to show that the only claim William made at that time was for a return of the amount paid upon the bond for deed and in part compliance with its terms. The same construction is applicable to his letter of 1886, two years later, wherein he states: "You agreed to pay me back all that I paid in on the place when you were here if I failed to pay for the place." If any place was purchased, it was the one included in the bond for deed, and the above is in harmony with its terms. Four years later, in February, 1890, he again wrote his brother advising that he was thinking of going

into the real estate business and wanted permission to sell the place. Six months later he advised his brother by letter that he had sold the ranch, and states: "I shall expect my four per cent. and as much more as you are a mind to give me." But nowhere in any of these communications is there a claim made that the deed was intended as a mortgage, or that he had any interest therein; but, on the contrary, they show that he was allowing his brother to sell and convey the place to receive all the proceeds except his four per cent. commission and as much more as his brother might give him, which last claim can consistently be construed as meaning that he thought his brother should give him more than the four per cent. for making the sale. The acts of ownership made by Gustavus, his taking open, notorious and continuous possession for the twelve years preceding his death with the consent and acquiescence of his brother William (who, during all that period, made no claim against him in any manner as to the deed being a mortgage or as to his having any right or interest therein); his admitting in his letters that Gustavus was the owner of the ranch; his getting permission to sell it for him; the making of a claim by William for a real estate broker's commission in case of a sale of the ranch by him; the refunding of the payment of the $80.00 paid on the bond, the deeding of the lots back to the wife of William (as per Gustavus's statement to his sister that he would do), and this system of affairs being allowed to prevail and continue until the time of the death of both brothers and thereafter for a period of nearly twelve years by the heirs of William, are all inconsistent with the position of a mere mortgagee in possession. And, while it is true, as repeatedly stated by this court, that the conclusions of the trial court upon conflicting evidence upon a

question of fact cannot be overthrown on appeal, unless the conclusion is so manifestly against the weight of evidence as to show that the lower court either misconceived its force and effect, or that its conclusions were influenced by passion or prejudice, the exceptions above stated are as well established as the rule itself.—*Caldwell v. Willey*, 16 Colo. 169; *Mitchell v. Reed*, 16 Colo. 109; *Beulah Marble Co. v. Mattice*, 22 Colo. 547; *Henry v. McNealey*, 24 Colo. 456; *Lamar M. & E. Co. v. Craddock*, 5 Col. App. 203; *Lawrence v. Weir*, 3 Col. App. 401; *Brinker v. U. P., D. & G. Ry. Co.*, 11 Col. App. 166; *Schoyer v. Leif*, 11 Col. App. 49.

The evidence in this case, under its most favorable light, supports, only by inference, the appellees' contention, and is entirely insufficient to justify the decree rendered. As stated by this court, in *Perot v. Cooper*, 17 Colo., at page 84:

"Since the written contract of September, 1882, accompanying the execution of the notes, purported on its face to be an absolute contract to convey an interest in land and other property, plaintiff was entitled to have its absolute character upheld at the trial, unless, by evidence clear, certain and unequivocal, the fact was established beyond substantial doubt that such contract was in fact given and accepted merely as collateral to secure the payment of the notes."

We say, here, the deed and bond for deed were complete, clear, certain, and we are of the opinion were not overcome by evidence clear, certain and unequivocal beyond substantial doubt, and that their validity should have been upheld at the trial; for which reasons the judgment is reversed and the cause remanded.       *Reversed.*

Mr. Justice Gabbert and Mr. Justice White concur.