FRANK E. JACKSON, In Equity, *vs.* WILBUR A. MAXWELL.

Kennebec.    Opinion May 22, 1915.

*Conditional Sale.    Deed Intended as Mortgage.    Equity of Redemption.    Mortgage.*
*Quitclaim Deed.    Warranty Deed.*

Plaintiff claims that defendant agreed to advance amount due from plaintiff to
Tolman and take a deed from Tolman purporting to convey a fee and be abso-
lute on its face, but which in fact would be a mortgage for money advanced.

*Held:*

1.   It is incumbent upon the plaintiff to prove by the degree of evidence required
in this class of cases that not only he, himself, understood this transaction to be
a mortgage, but that Maxwell, as well, understood it in the same way.

2.   The degree of evidence required to convert a deed into a mortgage is and
should be very high; otherwise, no man would be safe in taking a deed of
property, especially with prospects of rapid increase in value.

3.   The evidence must be of such weight and character as would justify a Court
in reforming a written instrument, which upon the ground of mistake did not
set forth the intention of the parties thereto.

4.   In each case, the burden rests upon the moving party of overcoming the
strong presumption arising from the terms of a written instrument.

5.   If the proofs are doubtful and unsatisfactory, if there is a failure to overcome
this presumption by testimony entirely plain and convincing beyond reason-
able controversy, the writing will be held to express correctly the intention of
the parties.

On appeal.    Appeal sustained.    Bill dismissed with costs.

This is a bill in equity, brought by plaintiff to redeem the premises
described in plaintiff's bill from an alleged equitable mortgage held
by the defendant on said premises, in favor of the plaintiff.    An
answer and replication were filed.    The cause was heard by a single
Justice, and from the decree entered by said Justice, the defendant
appealed to the Law Court.

The case is stated in the opinion.

*C. A. Knight, and Alfred B. White,* for plaintiff.

*Andrews & Nelson,* for defendant.

SITTING: SAVAGE, C. J., SPEAR, KING, BIRD, HANSON, JJ.

SPEAR, J.   The undisputed facts in this case are as follows:   In 1889 the plaintiff became the owner of an orchard in the town of Monmouth, which has become the subject of the present controversy. It would appear from the evidence that this property was, all along, until it was paid, subject to a mortgage to Dr. Marston.   In 1892 the plaintiff by warranty deed conveyed the orchard, subject to the Marston mortgage, to B. F. Tolman of Waltham, Mass.   At the time, the plaintiff was owing Tolman $2000 and later had more money of him.   Although informed by Jackson, as he says, that the Marston mortgage was "all paid up," Tolman found upon investigation that he "had only two days to redeem it in."   Upon this mortgage he paid $1210.   The equity expired in his hands and he acquired an absolute title, free from any agreement, whatever, with Jackson.

The case also shows that Tolman, on May 24, 1895, gave to Wilbur A. Maxwell, the defendant, a quitclaim deed, with covenants of warranty against all incumbrances made or suffered by him and against the lawful claims and demands of all persons, claiming, by, through or under him.   The plaintiff so far as the papers show was an entire stranger to this transaction.   The bill alleges that Tolman held the warranty deed as a mortgage, and the title by foreclosure in trust, for him.   While under the evidence this contention could not be conceded, it is immaterial whether it be so or not.   A, holding absolute title, may convey to B, by absolute deed, and make the deed an equitable mortgage in favor of C.   Whether this can be done is a matter of proof, not of law.

The plaintiff further alleges that the defendant agreed to advance the amount due from the plaintiff to Tolman, and take a deed from Tolman, "which should purport to convey a fee and be absolute on its face but which in fact should be a mortgage on security," for the money advanced.

It is incumbent upon the plaintiff to prove by the degree of evidence required in this class of cases that not only he, himself, understood this transaction to be a mortgage, but that Maxwell, as well, understood it in the same way.   *Stinchfield* v. *Milliken*, 71 Maine, page 517.   "The criterion is the intention of the parties."

We may perhaps first properly allude to the degree of evidence required to convert a deed into a mortgage.   It is and should be very

high.   Otherwise no man would be safe in taking a deed of property, · especially with prospects of rapid increase in value.   When it had doubled or trebled, it would be only necessary for the grantor to bring witnesses to testify to an agreement, that the deed was regarded as an equitable mortgage, to enable him, upon payment of the purchase price and interest, to redeem.   So dangerous is the doctrine of converting an absolute deed into a mortgage that some States deny the application of the doctrine at all, except upon proof of fraud, accident or mistake.   This is the rule in Connecticut, Florida, Georgia, Kentucky, North Carolina and Rhode Island.   In New Hampshire, R. S., Chap. 139, Sec. 2, and Pennsylvania, Act of June 8, 1881, *Sainsby* v. *Howley*, 118 Pa. St., 301; *O'Donell* v. *Vandersael*, 213 Pa. St., 551, such agreements have no force unless inserted in the deed.   By Code 1906, Miss., Par. 4783, the grantor must be in possession, to attack a deed.   In every other State the rule gives expression to the high degree of evidence required to convert a deed absolute into a mortgage, by the use of such terms as "clear and certain," "conclusive," "unequivocal."   The great source of authority holds that the plaintiff must prove his case, "by force of evidence sufficient to command the unhesitating assent of every reasonable mind."   "The evidence must be of such weight and character as would justify a court in reforming a written instrument, which upon the ground of mistake did not set forth the intention of the parties thereto."   *Howland* v. *Blake*, 97 U. S., 624.   The degree of evidence required to reform a written instrument is found in the cases collated in *Liberty* v. *Haines*, 103 Maine, 182.   These citations all agree in demanding proof practically beyond a reasonable doubt.   The testimony must be above suspicion.   It cannot be warped by the bias or interest of a party.   See paragraph 1, page 627, *Howland* v. *Blake*, supra.   Finally may be cited the principle found in this case on page 626, as a salutary rule for the government of this class of cases:   "In each case the burden rests upon the moving party of overcoming the strong presumption arising from the terms of a written instrument.   If the proofs are doubtful and unsatisfactory, if there is a failure to overcome this presumption by testimony entirely plain and convincing beyond reasonable controversy, the writing will be held to express correctly the intention of the parties. A judgment of the court, a deliberate deed of writing, are of too much solemnity to be brushed away by loose and inconclusive evidence.

Story, Eq. Jur., Sec. 152; *Kent* v. *Lasley*, 24 Wis., 654; *Harrison* v.
*Juneau Bank*, 17 id., 340; *Harter* v. *Christoph*, 32 id., 246; *McClellan*
v. *Sanford*, 26 id., 595."

If we now advert to the testimony upon which the plaintiff seeks
to transform a deed, absolute in terms, into a mortgage, we find the
following given by Jackson, the party in interest, nineteen years after
the alleged conversation is claimed to have taken place. After stating
that he had been to several parties with an endeavor to find some
one who would pay his indebtedness to Tolman he proceeded to say:
"And in the meantime, I wrote my cousin, Mr. Maxwell, about
taking up the mortgage, and we went up to Mr. Maxwell's house and
met him in the yard. I introduced Mr. Tolman to him and I said to
Mr. Tolman: 'You have a claim on the orchard there to about one-
third of the value of it;' and I said to Mr. Maxwell: 'It is a small
amount and I want you to take it up;' and he said he would. He
said: "I will, why certainly I will;' and we went into the house and
had dinner and I went home with Tolman and the arrangement was,
Mr. Maxwell should take Mr. Tolman down to Augusta and fix up
the deeds." But this statement was evidently not satisfactory to
counsel and he attempted to call his attention to a further state-
ment as follows: Q. In this conversation was there anything said
about— This was objected to and counsel did not proceed further
in this particular line, but asked this question: Q. To come back
to the conversation you had with Mr. Maxwell in the yard in Tolman's
presence, what else was said? A. I said, you are located here to
take care of the place while I am away—I am going away. Then
counsel further says: I simply want to remind you— At this
juncture the court intervened and observed that it would hardly be
proper to make any suggestion at this point. But counsel persisted
and finally asked the question as to what conversation he had with
Maxwell "relative to your financial condition," and here the plaintiff,
having finally got a clue to what he wanted to say, makes another
entirely different statement from his first one, saying: "After
introducing Mr. Tolman, I said to Mr. Maxwell; 'Mr. Tolman has
a claim over this orchard for $2000, and I want you to take it up and
hold it on a mortgage until I can pay it back, and I will pay it back
with interest, and you pick the apples and look after the orchard while
I am away.'"

It should here be observed that we are now considering this testimony as the uncontradicted evidence of the plaintiff. No finding of fact can change it. The only finding to be made is one of law, whether such testimony comes within the well settled rules of evidence, touching the proof required to convert a deed absolute into a mortgage. Accordingly, independent of any finding of fact by the sitting Justice, we are of the opinion that this ex parti testimony, nineteen years old, conflicting in itself, does not meet the high degree of proof demanded in this class of cases. In his voluntary statement before he was allowed to make his later conflicting statement Jackson never mentioned the word "mortgage" at all. Tolman in his testimony adds nothing to the force of the plaintiff's evidence tending to establish that the deed given by him to Maxwell was to be regarded as a mortgage. We think the true inference of law to be derived from this undisputed testimony is, that the most the plaintiff could claim, was that the conveyance of Tolman to Maxwell was a conditional sale.

But this testimony does not stand uncontradicted. It is squarely and positively denied by the defendant, Maxwell, who, from anything that appears in this case, must be regarded, at least, to be as reliable a witness as the plaintiff. The evidence shows him to be a man of substance and character, who, through an industrious and proper use of his efforts for nineteen years, has successfully cultivated and cared for this orchard. At the outset Maxwell freely admits that he agreed with Jackson that if he wanted to pay for this orchard within a year he would convey it to him. But this, as the evidence shows, was on condition that he paid within a year. On cross-examination the defendant testified as follows: Q. You knew perfectly well he had an interest in the orchard? A. I knew he had had. Q. Didn't you know at the time? A. No; I knew he had had. Q. What was he around there for? A. To help Mr. Tolman get rid of it; Mr. Tolman and he were good friends. Q. And did he tell you he had an interest in the orchard? A. No; Tolman was the one that had the orchard. Q. Why did you give him the right to redeem? A. He was fussing around there and made a lot of talk about too cheap, and I says: "If you want this back at the end of the year, you can have it." Q. Tolman claimed to you he owned the orchard outright? A. Tolman owned that orchard outright. Q. He told you so? A. Yes, sir. Q. Then what did

you want to pay any attention to Jackson's claim for?  A.  I don't know why I did.  He was around there talking that way and I told him that.  Q.  Didn't he tell you that the orchard was his?  A.  No. Q.  And that he had a claim on it?  A.  He didn't have any claim. Q.  And you simply gave him the right of redemption out of the goodness of your heart?  A.  Yes, sir; I don't know whether he had any right there.  Q.  But he did stay around and talk?  A.  Yes, sir; he did.  Q.  And you told him that?  A.  I told him he might have that at the end of a year if he would pay the bills on it. In effect this testimony differs but little from that of Jackson and Tolman, but fairly establishes the conclusion that it was never Maxwell's intention that this conveyance to him should be regarded as a mortgage.  The last answer, above quoted, shows just how Maxwell understood the matter.

But it is said, in response to a letter from Mrs. Jackson, who appears as a witness under the name of Mrs. Johnson, that he went to see her and had conversation with her regarding Jackson's right to take back this orchard.  This happened just a few days before the year expired.  This conduct on the part of Maxwell was in perfect harmony with what he claims was his arrangement with Jackson, that if he would pay the debt and for the improvements, within a year, he would convey the property back to him.  Mrs. Johnson's testimony has no tendency to contradict the defendant's contention.  On the other hand, the testimony of Mrs. Maxwell with reference to this conversation corroborates the position of the defendant.  She says in answer to the question of what conversation took place, "She came out to the carriage and asked how much that orchard was.  She said Frank thought he would like it back and asked how much it would be and Mr. Maxwell gave her the figures." She says Mr. Maxwell further told the then Mrs. Jackson after she said she did not think Frank would want it at the price—about $3000 which was due on it—that Maxwell would like to know as soon as possible because there were fences to build.  It was in the spring of the year and there were fences to build; and he wanted to go to work there.  And if Mr. Jackson wanted to buy the orchard back he would not care to do the work; and she said: 'I will cable him and let you know.' "  This language clearly shows that in the mind of Maxwell and Mrs. Johnson the question was whether Jackson "would like it back."  This is confirmed by the further question of

Maxwell, as above shown, if he "wanted to buy the orchard back" he would not care to do the work, etc. The language "to buy the orchard back" is significant and shows what Maxwell's conception of the transaction was. The testimony of Mrs. Maxwell from anything that appears in this case is certainly as reliable as the testimony of Mrs. Johnson and in so far as it contradicts her is entitled to equal weight.

The burden is heavily upon the plaintiff to establish the truth of his contention. To do this under the universal rules of law it was incumbent upon him to produce testimony that should be conclusive and convincing, as has already been shown by the authorities cited.

But the evidence in favor of the defendant does not end here. The circumstances and probabilities corroborate his contention. In *Howland* v. *Blake*, above cited, the court held that the fact that a deed, alleged to have been a mortgage, was not challenged for eight years was a circumstance in contradiction of the claim. In the case before us, however, for nineteen years the plaintiff slumbered on his rights, with the exception of an inquiry made at the end of the first year, to which allusion has been made; and not a scrap of writing ever passed between the parties during this time, nor did the plaintiff, himself, ever make any inquiry about it except that, about five years after the transaction, he called at Maxwell's blacksmith shop in Monmouth, when he says he told Maxwell he was not acting square; that he agreed to give up the orchard on payment of money and improvements, Maxwell's version of which is, "he wanted me to give him $20.00; he said he was hard up. He said I got that orchard too cheap. I told him I put in all the money I wanted to; that is the last I heard until this started up last April." This indifference and delay is not the conduct of a man who believed that he had a subsisting interest in this orchard and a right of redemption. It is inconsistent with the claim that the deed was a mortgage and consistent with the defendant's contention that it was an absolute sale, conditioned upon the right of the plaintiff to pay the debt and improvements and take it back at the end of a year.

But this is not all. The testimony of Daniel Boynton, the only witness in the case, whose testimony as to the value of this orchard in 1895, can be considered as of any value, gives this very significant testimony. A. Mr. Jackson came to me, and wanted to know if I would buy that orchard; and I told him I had not thought of it;

and he talked some time, and he said to me to make a price of what I thought the orchard was worth; and after a while I told him what I thought it would be worth.  Q.  What was it?  A.  Two thousand dollars, if it was in such good shape as I thought it might be.  And then nothing would do but I must go and look at it.  Q.  And did you go?  A.  Yes, sir; I harnessed my team and we went up  there and looked at it.  And I told him I would not give $2000—it was not worth it to me, the condition it was in.  The place had been neglected for three or four years, and somebody had went in there— they had hired somebody to do the cutting of the bushes.  And they had been cut so they laid down; and the small brush and bushes had grown up all through this brush and all through the orchard; and I didn t want the job myself of clearing it up; and I didn't take the orchard."  This testimony, if true, is an  overwhelming circumstance touching the true character of this transaction.  Mr. Boynton was an orchardist himself, living right across the pond from this orchard, and familiar with the value of orchards in the vicinity of Monmouth. He says he examined this orchard, upon request of Jackson, as a prospective purchaser and declined to offer $2000.  The first inquiry is, is this testimony true?  Can its character and truthfulness be questioned?  It is rebutted, indeed, by Jackson on his cross-examination before Boynton had testified, by a denial that he ever saw Mr. Boynton till the trial.  But after Boynton had testified, in detail, as to what was said and done, both upon direct and cross-examination, Jackson did not take the stand to deny or contradict a single sentence given by Boynton.  This testimony shows a reckless indifference, on the part of Jackson, of a proper regard for truth, and stamps with suspicion the character of the testimony upon which he seeks to reform a written instrument.  The testimony of such a witness, whatever the source of its weakness, does not meet the standard of proof required.  It is unquestionably erroneous if not intentionally false, for the statement of Boynton cannot be challenged.

Again, if Mr. Boynton's testimony be true, there appears another statement which not only contradicts Jackson's word, but his whole attitude towards this transaction when he got Maxwell to advance $2000.  Boynton says Jackson asked him to make an offer on this orchard, "and after a while I told him what I thought it would be worth.  Q.  What was it?  A.  Two thousand dollars if it was in such good shape as I thought it might be." . Now what occurred is

the crucial test of Jackson's position, showing his manifest eagerness to sell for $2000. Mr. Boynton says: "And then, nothing would do but I must go and look at it," and he did and declined to pay $2000. He did not say anything to Boynton about an equitable mortgage, or obtaining money on the orchard as security. He wanted to sell. And the only reasonable inference from this uncontradicted testimony is that he was ready and even anxious to sell for $2000, as he insisted upon Boynton's examination of it at this price.

This fully corroborates Maxwell and fairly authorizes the inference that Jackson's only aim was to get a purchaser who would pay the debt of his friend, Tolman, and that his claim at the time of the transaction of the great value of the orchard in excess of the amount due Tolman was to induce Maxwell to advance the money. Furthermore, the testimony of Boynton shows that the market value was not over $2000. If this be so, then appears another unimpeachable circumstance that proves the transaction was not a mortgage. Is it probable that Maxwell would have taken a mortgage on a piece of real estate in Monmouth at its full face value? It is almost inconceivable that any ordinary business man would do it. But it was perfectly business like for Maxwell to say, when Jackson was magnifying the value of this property, that if he wanted to buy it back in a year, with the improvements, he could do so.

But it seems unnecessary to go further. We are of the opinion that the true inference to be drawn from the unquestionable facts is that the transaction in question was not a mortgage, but a conditional sale, if anything. Again, the delay of nineteen years is utterly inconsistent with the contention that the deed absolute in form was a mortgage. Men do not slumber on their rights in this way. Maxwell most certainly would not have expended his labor and applied his personal skill as an orchardist, to have them both consumed in the inadequate return to be found, in an accounting, and the amount due for redemption. His natural skill, the bestowal of which upon an orchard makes the difference between a thrifty, good bearing tree and a scrubby worthless one, so commonly contrasted, side by side, in adjacent ownerships, Maxwell will have entirely lost, as he can recover nothing for the prosperous condition of the orchard. That he would have wasted his entire time and energy, for the best part of his life, upon an orchard he did not consider his own seems absurd and preposterous. From the inherent

evidence of the whole case, it is apparent Maxwell never understood he was giving a mortgage and accordingly no such mutuality of understanding is found as is necessary to establish proof of a mortgage.

*Appeal sustained.*
*Bill dismissed with costs.*