[Sac. No. 5006.   In Bank.—August 18, 1936.]

## C. C. CARLSON et al., Respondents, v. JANE R. ROBINSON et al., Appellants.

James, Brann & Rowe for Appellants.

George C. Faulkner and William T. Doyle for Respondents.

THOMPSON (R. L.), J., *pro tem.*—The defendants, Jane R. Robinson and The Santa Fe Lumber Company, have appealed from a judgment quieting title in plaintiffs

to block 5 in the city of Turlock, subject to a mortgage of $10,781.29 held by the appellants. It is contended the court's finding that the appellants are not the owners of the land in fee simple is not supported by the evidence.

The only question involved on this appeal is whether the record contains sufficient evidence to sustain the findings and judgment to the effect that a quitclaim deed which was executed and delivered by the plaintiffs to the appellants was intended by the parties to be a mere mortgage to secure an existing indebtedness.

We are of the opinion the evidence amply supports the findings and judgment holding that the quitclaim deed in question was a mortgage given to secure the existing indebtedness of the plaintiffs, and that the court was therefore warranted in quieting title to block 5 of the city of Turlock in plaintiffs, subject to a lien thereon to secure their indebtedness to The Santa Fe Lumber Company in the sum of $10,781.29.

There is no controversy regarding the well-established rule of law to the effect that a deed of conveyance to real property which is absolute on its face will be construed to be a mere mortgage to secure existing indebtedness only upon clear and satisfactory proof thereof. (*Wehle* v. *Price,* 202 Cal. 394 [260 Pac. 878]; 17 Cal. Jur. 756, sec. 58.) But where the record contains satisfactory evidence that the deed was intended as a mortgage, a court of appeal will not disturb the findings of the trial court to that effect. In the Wehle case, *supra,* it is said in that regard:

"The courts have been watchful against all schemes of money lenders to deprive unfortunate debtors of their lands at less than their true value under the claim that the transaction is a purchase and not a loan, and the rule is well settled that a deed absolute in form, if intended as security for the payment of a debt, is a mortgage. (Civ. Code, secs. 2924, 2925; 17 Cal. Jur., sec. 41, p. 735 et seq.) The question is primarily one of fact, upon which the findings of the trial court, if supported by proper evidence, will not be disturbed, notwithstanding conflict in the testimony. (17 Cal. Jur., sec. 59, p. 758 et seq.)"

We are satisfied the following *résumé* of the evidence clearly establishes the fact that the quitclaim deed was

intended as a mortgage, and that the findings and judgment are adequately supported thereby.

Prior to July 2, 1926, the plaintiffs owned block number 5 in the city of Turlock, which is involved in this suit. The Turlock Lumber Company is a one-man corporation owned and controlled by C. C. Carlson, one of the plaintiffs in this action. During all of the time which is involved in this suit it was conducting a lumber business in Turlock and occupying the premises in question. In the year 1926 the Turlock Lumber Company was indebted to The Santa Fe Lumber Company in the sum of $17,000, evidenced by three unsecured promissory notes dated April 24, 1926. J. A. Russell was the secretary and manager of The Santa Fe Lumber Company and Walter Brann was its vice-president and attorney. Jane R. Robinson was the private secretary of Walter Brann. She had no interest in the corporation.

In July, 1926, Mr. Russell, accompanied by Mr. Brann, called on C. C. Carlson and requested collateral security in the form of a grant deed for these three notes, saying that their bank ''would not accept these notes without proper collateral''. In compliance with their request the plaintiffs executed and delivered to Jane R. Robinson their deed to block 5 in Turlock. At the same time a written defeasance of the deed was executed and acknowledged by the grantee conditioned on the payment of the three notes according to the terms thereof. It is conceded those instruments constituted a mere mortgage to secure the payment of that debt.

Prior to the execution of the last-mentioned deed, Carlson was also indebted to the Commercial Bank of Turlock, which afterward became the Bank of America, in the total sum of $15,540, represented by three other notes secured by a trust deed dated June 2, 1924, on this same block number 5. It is undisputed that the first-mentioned grant deed, which was executed in 1926, therefore became a second mortgage on the property subject to the last-mentioned trust deed held by The Commercial Bank of Turlock. The condition and security of both of these loans remained the same until 1928.

The bank loan of $15,540 was about to outlaw. In June, 1928, Mr. Whipple, representing the Bank of America,

requested Carlson to renew the loan. The bank did not then know that The Santa Fe Lumber Company or Jane R. Robinson was interested in the property or that they held a lien thereon. Upon learning of the subsequent deed which was held by Robinson, the bank suggested that Carlson persuade Jane R. Robinson to convey the property back to him, so that the bank loan could be refinanced and secured by a first lien on the property. Otherwise the bank refused to renew the loan. This suggestion was made to The Santa Fe Lumber Company and declined. It was, however, agreed that the bank loan might be renewed and collaterally secured and the lumber company would acknowledge in writing that those instruments should take precedence as a lien over its grant deed which was held in the name of Jane R. Robinson. This proposal was rejected by the bank. The bank then gave notice of the foreclosure of its trust deed. In January, 1929, Mr. Russell called Carlson on the telephone and told him the bank had given notice of foreclosure of its trust deed, and advised him to act promptly. Carlson said he would see the bank and would attend to the matter at once. Russell replied, ''No, you better keep away from it. . . . We'll see what we can do down here.'' Following this conversation, The Santa Fe Lumber Company wrote Carlson a letter dated January 8, 1929, asking him to see Mr. Brann about the matter, saying, among other things, ''We want to do everything we can for you, and do not want to see you lose this very valuable property. . . . I think (it is) in your own interests, to say nothing of ours'' to attend to this matter.

January 11, 1929, Carlson visited the office of The Santa Fe Lumber Company in San Francisco. He then interviewed Mr. Russell, who advised him to go to their attorney, Walter Brann, to conduct the refinancing procedure for him, saying, ''You can rely on anything he does, . . . You perhaps better have Mr. Brann act for you also.'' Carlson and Russell then went to the office of Mr. Brann. The agreement which was then reached regarding the plan of refinancing the bank loan is incorporated in a letter from Russell as manager of The Santa Fe Lumber Company to Carlson. It clearly outlines a plan to procure a renewal of the bank loan and to preserve the *status quo* of the respective parties. The Santa Fe Lumber Company pro-

posed to arrange to raise money necessary to liquidate the bank claim and to preserve its lien on the property by continuing to carry the property "in name of Jane R. Robinson . . . to enter into lease with Turlock Lumber Company . . . monthly rental to be based on yearly taxes, say $500.00, plus 7% interest *on account of mortgage* . . . plus 7% interest on indebtedness of Turlock Lumber Company to Santa Fe Lumber Company. Lease in question to have incorporated therein an option whereby Turlock Lumber Company may purchase (the property) . . . Purchase price at which option is to be given to be the amount of indebtedness of Turlock Lumber Company to Santa Fe Lumber Company." It will be observed there was then no suggestion of Carlson giving to The Santa Fe Lumber Company a quitclaim deed to the property.

Subsequently Carlson sent to The Santa Fe Lumber Company his check for $2,000, the receipt of which was acknowledged. He then sought a loan from the Modesto Building and Loan Association, which The Santa Fe Lumber Company rejected "because the rate of interest was too high". Mr. Russell wrote Carlson a letter February 1, 1929, regarding that matter, in which he said: "This acknowledges your two checks received this morning, totaling $2,000.00. . . . There has also been received a letter from the Modesto Building & Loan Assn., but you, of course, appreciate that their rate of interest is very high, and we are now working on another line, . . . at a less rate of interest." The letter also stated: "They (the bank) will hold it (the foreclosure proceedings) up temporarily and give us a chance to turn around and see if we can, between us, *protect your interests.*"

Subsequently the bank loan was paid by means of a new note which was executed by Jane R. Robinson, and guaranteed by The Santa Fe Lumber Company. Mr. Whipple, representing the Bank of America, testified that his bank agreed to accept the note of Robinson to refinance the Carlson debt, only on condition that he would execute a quitclaim deed to her. He said, "I was the one that asked him to sign it." The quitclaim deed was prepared by Mr. Brann February 6, 1929, at the request of Carlson as a mere security of the bank's loan to Robinson. Mr.

Carlson testified in that regard: "I stated to either Russell or Brann that the bank demanded it and for them to prepare it, that it wasn't to be recorded, not to be any part of our deal, it was being executed for the security of the bank."

The agreement not to record the quitclaim deed is corroborated by Mr. Erskine, attorney for the bank. In a letter of instructions to the bank in that regard he said, "My understanding with the attorney for the Santa Fe Lumber Company (Mr. Brann) is that neither the deed nor the agreement subordinating interest are to be recorded." In accordance with this agreement the quitclaim deed was not recorded. It appears evident that this quitclaim deed was not given to The Santa Fe Lumber Company by Carlson to relinquish his interest in the property. It was given at the request of the Bank of America to protect their lien on the property in the plan to refinance the loan of Carlson, and at the same time to secure his indebtedness to the lumber company. Mr. Brann, who acted in behalf of the Carlsons in that matter, and who therefore owed to them the highest degree of good faith, prepared the quitclaim deed for them. The Carlsons relied upon him to protect their interests.

January 1, 1929, the Turlock Lumber Company was indebted to The Santa Fe Lumber Company to the extent of $20,000. Between that date and February 11th of the following month this indebtedness was reduced to $10,781.29, which was all that was due the lumber company at the time of the execution of the quitclaim deed.

According to the plan for refinancing the bank loan, after the quitclaim deed had been executed and delivered, Mr. Brann drew a lease to the property in behalf of the Turlock Lumber Company with payments based on the assumption that the purported rental fixed at $351.15 per month would include 7 per cent interest on the bank loan, 7 per cent interest on The Santa Fe Lumber Company indebtedness, taxes, insurance and $166.67, being one-twelfth of a total sum of $2,000 which the Carlsons agreed to pay in reduction of the bank loan the first year. This was understood by The Santa Fe Lumber Company, for when the proposed lease was prepared by Mr. Brann and

sent to the Carlsons, it was accompanied by a statement to that effect on the company's letterhead, as follows:

"To rent of Block # 5 Turlock, Feb.

| | | |
|---|---|---|
| 10, 1929 to March 10, '29 . . . . . . . | | $351.15 |
| "The above in accordance with signed lease, and made up as follows: | | |
| 1/12th of 7% interest on $14,500 . . . . . $1015.00 | | $ 84.58 |
| 1/12th of 7%     "          10,781.29 . | 754.69 | 62.89 |
| 1/12th amount reduction in mortgage . . | 2000.00 | 166.67 |
| 1/12th estimated taxes, per year . . . . . . | 400.00 | 33.34 |
| 1/12th of insurance premium on improvements . . . . . . . . . . . . . . . . . . . . . . . | 44.00 | 3.67 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | $351.15" |

This statement and lease refutes the theory of an absolute conveyance of the property. If the title passed to The Santa Fe Lumber Company, why should the lessee be charged with taxes and insurance. Moreover, the monthly payments of purported rental includes a pro rating of payments on the indebtedness of both the bank and the lumber company. Other statements in the correspondence with relation to that subject indicate that the quitclaim deed was not intended to convey title, but was merely the means by which the refinancing should be accomplished so as to protect both creditors of the Carlsons and keep their interests *in status quo.* Among these statements indicating the intention of the parties in executing the quitclaim deed and the lease was a statement made by Mr. Russell in reply to Mr. Carlson's suggestion that the item of depreciation of the property should be taken into consideration in fixing a figure representing the monthly payments to be made on the indebtedness. Mr. Russell said: "Why should you figure depreciation *on your own . property?*" That item was therefore eliminated.

Confirming the findings to the effect that The Santa Fe Lumber Company knew the quitclaim deed, which was never recorded, was not intended as an absolute conveyance of title, the company sent Carlson a bill of $100 for legal services performed in connection with the refinancing proceedings, including, "Consultations, advice and the drawing of deeds and leases." It is inconsistent for that company to present a bill to the grantor for legal services in

connection with the conveyance of title to itself. Likewise, on February 19, 1929, the company also sent Carlson a bill for the payment of title insurance and recording of the instruments incident to the refinancing of the bank debt, as follows:

"Policy of title insurance, $15,000.00.............$87.50
Recording reconv. Whipple-Carlson.............. 1.10
Recording deed Robinson-Robinson.............. 1.00
Recording Tr. Deed Robinson-Bank of America.... 3.80

$93.40"

It appears that the Carlsons at all times occupied and used the premises upon which they conducted the Turlock Lumber Company business. The value of the property was estimated at from $30,000 to $40,000. It was appraised at $31,874.50. The foregoing evidence adequately supports the findings and judgment.

The judgment is affirmed.

Shenk, J., Curtis, J., Seawell, J., Waste, C. J., and Pullen, J., pro tem., concurred.