[Sac. No. 5386.   In Bank.   Apr. 3, 1944.]

C.  W.  BEELER, Respondent, v. AMERICAN  TRUST COMPANY (a Corporation), Appellant.

Brobeck, Phleger & Harrison, Carr & Kennedy and M. B. Plant for Appellant.

Morrison, Hohfeld, Foerster, Shuman & Clark and Landels & Weigel, as Amici Curiae, on behalf of Appellant.

Carter, Barrett & Carlton, Daniel S. Carlton, Oliver J. Carter, McGregor & McGregor, Major McGregor and Dudley G. McGregor for Respondent.

CURTIS, J.—A rehearing was granted herein to permit additional study of the points involved. The further consideration consequently given this case has only served to confirm the conclusions heretofore reached, and accordingly, the following opinion expresses our sustained views.

The defendant, American Trust Company, appeals from an adverse judgment holding that a deed absolute in form was in fact an equitable mortgage. The principal contention presented by the defendant bank as a basis for a reversal of the

judgment is the familiar claim that the evidence is insufficient to justify the conclusion of the trial court. As a related consideration, it is particularly urged that a verified affidavit of the grantor declaring the contemporaneously executed deed to be an absolute conveyance of the property, and not intended as a mortgage, is a conclusive expression of the understanding between the parties and precludes the admissibility of parol evidence to the contrary.

The facts and circumstances surrounding the transaction out of which this controversy arose appear to be substantially as follows: Prior to July 28, 1937, Henry Weiss owned a large tract of land in Tehama County subject to a deed of trust dated March 21, 1933, running in favor of the American Trust Company to secure two promissory notes for the aggregate sum of $74,400 and bearing interest at the rate of $5\frac{1}{2}$ per cent per annum. Weiss was unable to make the stipulated payments and on October 5, 1936, he was served with a notice of default announcing the bank's election to proceed with the sale of this ranch property. At the request of Weiss the foreclosure proceedings were delayed to give him an opportunity to try to find a purchaser. In June, 1937, Weiss introduced C. W. Beeler to the officers of the bank interested in this matter, and the parties thereupon discussed various propositions looking toward a discount of the debt and its reduction to a satisfactory figure incident to Beeler's purchase of the property. Finally, Mr. Hammond, an assistant vice-president of the bank, agreed to accept $55,000 in cash if that sum were paid within the next few weeks. On July 28, 1937, Weiss conveyed the ranch to Beeler, and it was expressly provided in the terms of the transfer that Beeler assumed and agreed to pay the indebtedness secured by the deed of trust. At the same time Weiss executed and delivered to Beeler a bill of sale of certain personal property on the ranch.

The financial arrangement contemplated by Beeler as the basis for his negotiations with the bank for the early discharge of the debt on the property at the discounted figure did not materialize, and as of September 1, 1937, no part of the $55,000 had been paid. Accordingly, on the last-mentioned date the bank served upon both Beeler and Weiss a second notice of default. The indebtedness on its original scale had then increased to the aggregate sum of $81,000.

Subsequent to said notice and on September 22, 1937, Beeler visited the bank for the purpose of negotiating with its officers some refinancing plan whereby he might continue to retain the ranch and have an extension of time for the payment of the debt as theretofore reduced. The bank's officers refused to carry this property transaction any longer on the records as a security arrangement, and they therefore proposed the following course of procedure: Beeler would deed the property to the bank and in return the bank would execute to Beeler a lease of the premises for the period of one year at a rental of $3,000 per annum, Beeler to pay all taxes and maintenance expense on the ranch and to have an option to purchase the land at any time during the term of the lease for the sum of $60,000. Beeler accepted this proposition and by an absolute deed dated September 27, 1937, he conveyed the property to the bank. As an accompanying instrument, Beeler executed and delivered to the bank his verified affidavit, in which he stated that said deed ''is intended to be and is an absolute conveyance of the title to said premises to the grantee named therein, and was not and is not now intended as a mortgage, trust conveyance or security of any kind; that it was the intention of affiant as grantor in said deed to convey, and by said deed this affiant did convey to the grantee therein all his right, title and interest absolutely in and to said premises; that possession of said premises has been surrendered to the grantee; that in the execution and delivery of said deed affiant was not acting under any misapprehension as to the effect thereof, and acted freely and voluntarily and was not acting under coercion or duress; that the consideration for said deed was and is the full cancellation of all debts, obligations, costs and charges secured by that certain deed of trust heretofore existing on said property, . . . and the reconveyance of said property under said deed of trust; . . . This affidavit is made for the protection and benefit of the grantee in said deed, its successors and assigns, . . . and particularly for the benefit of the TITLE INSURANCE AND GUARANTY COMPANY, which is about to insure the title to said property in reliance thereon, . . .'' Pursuant to the terms of this affidavit, the bank executed a reconveyance under its trust deed reciting that the indebtedness thereby secured had been fully paid.

On November 5, 1937, both the deed from Beeler and the reconveyance were duly recorded.

As of May 16, 1938, neither installment of the 1937-1938 taxes on the ranch had been fully paid, and on said mentioned day the bank served upon Beeler a notice to pay the taxes or quit the premises for failure to comply with the terms of the lease. The parties were unable to settle their differences on this score and in July, 1938, the bank brought suit in unlawful detainer seeking Beeler's eviction from the property. In the ensuing trial Beeler successfully maintained his defense on the ground that the notice of breach given him was defective, and judgment was rendered accordingly in his favor.

On October 19, 1938, Beeler commenced this action against the American Trust Company to have his deed of conveyance to the defendant bank declared a mortgage to secure the antecedent debt. In his complaint plaintiff alleged that the bank agreed to reduce the outstanding indebtedness against the property to the sum of $60,000 to be paid, together with interest at the rate of 5 per cent per annum, within the period of one year as provided by the terms of the lease, and that the bank accepted the deed of conveyance as a mortgage to secure that debt. To this complaint the defendant bank filed an answer and cross-complaint, denying the material averments of the plaintiff's pleading and asserting that the parties intended the deed to be an absolute transfer of title to the property as it in form purported to be, and not a mortgage or other security arrangement. With the principal controversial issue thus defined, the action proceeded to trial, and at the conclusion thereof the court adopted findings favorable to the plaintiff. Judgment was rendered accordingly against the defendant bank, determining the plaintiff, C. W. Beeler, to be the owner in fee of the property in question subject to a mortgage lien as security for the payment of the following sums: (1) the agreed indebtedness of $60,000, together with interest at the rate of 5 per cent per annum, according to the terms expressed in the lease and option agreement; and (2) the first installment of the 1937-1938 taxes, $477.88, with interest from the date of the entry of the decree herein. It was further ordered that on receipt of these sums within the time limitation specified by the court, the defendant bank should reconvey the property to the plaintiff and

execute and deliver to him a release and satisfaction of the lien thus adjudicated. From this judgment the defendant, American Trust Company, prosecutes this appeal.

■ It is without doubt the law, as repeatedly declared in our decisions, that clear and convincing evidence is required to justify a court in finding that a deed which purports to convey land absolutely in fee simple was intended to be a mortgage. "That a deed purporting on its face to convey the title absolutely may be shown by parol evidence to be something else—namely, a mortgage—is a striking exception to the general rule, and it has been universally held that the character of the instrument cannot be thus changed except upon clear and convincing evidence." (*Woods* v. *Jensen,* 130 Cal. 200, 203 [62 P. 473] ; see, also, *Mahoney* v. *Bostwick,* 96 Cal. 53 [30 P. 1020, 31 Am.St.Rep. 175] ; *Sheehan* v. *Sullivan,* 126 Cal. 189 [58 P. 543] ; *Emery* v. *Lowe,* 140 Cal. 379 [73 P. 981] ; *Wadleigh* v. *Phelps,* 149 Cal. 627 [87 P. 93] ; *Couts* v. *Winston,* 153 Cal. 686 [96 P. 357] ; *Todd* v. *Todd,* 164 Cal. 255 [128 P. 413] ; *Kohn* v. *Parent,* 174 Cal. 570 [163 P. 1008] ; *Lockhart* v. *J. H. McDougall Co.,* 190 Cal. 308 [212 P. 1] ; *Carlson* v. *Robinson,* 7 Cal.2d 235 [60 P.2d 426].) But whether or not the evidence offered to change the ostensible character of the instrument is clear and convincing is a question for the trial court to decide. (*Mahoney* v. *Bostwick, supra; Todd* v. *Todd, supra; Lockhart* v. *J. H. McDougall Co., supra;* 17 Cal.Jur. 757, § 59.) In such case, as in others, the determination of that court in favor of either party upon conflicting or contradictory evidence is not open to review on appeal. (*Sherman* v. *Sandell,* 106 Cal. 373 [39 P. 797] ; *Locke* v. *Moulton,* 132 Cal. 145 [64 P. 87] ; *Beckman* v. *Waters,* 161 Cal. 581 [119 P. 922] ; 17 Cal.Jur. 758, § 60.) As was said in this regard in *Wadleigh* v. *Phelps, supra,* at page 637, "the appellate court . . . will not disturb the finding of the trial court to the effect that the deed is a mortgage, where there is substantial evidence warranting a clear and satisfactory conviction to that effect. All questions as to preponderance and conflict of evidence are for the trial court."

■ A review of the record in the light of these rules does not establish that the finding declaring the deed in question to be a mortgage is without sufficient evidentiary support.

In construing the disputed financial arrangement concededly made as the result of the understanding reached be-

tween the plaintiff and certain officers of the defendant bank at the aforementioned conference of September 22, 1937, regard must be had at the outset for the parties' course of negotiations at that meeting relative to some appropriate disposition of the indebtedness secured by the property here involved under the outstanding deed of trust. In this connection the plaintiff testified at length at the trial, as the following pertinent excerpts from the record will show:

### DIRECT EXAMINATION

"MR. CARTER [plaintiff's attorney]: Q. Mr. Beeler, give us the conversation that took place between yourself and the representative of the American Trust Company on September 22, 1937.

"A. We all went into the little room, the small board of directors' meeting room, and sat down. I said, 'I am here to make some other arrangement than the present arrangement of paying the indebtedness off in 55,000 dollars cash. I find at this time I can't do it. The principal man that I had to get financed has been in an accident and had to have his arm amputated and has been in the hospital and he just couldn't do anything for me at that time.' I said, 'I want the ranch. I want to continue with the ranch. I don't want you to foreclose on it like this letter says, but is there some other way that we can do something about it? Is there some other arrangement we can make to carry this loan?' The conversation practically altogether was between Mr. Kennedy and myself. He said, 'There is not any way I can say. You have got to pay the money. That was the agreement and that is what we have got to have.' I said, 'Well, I just can't pay it but there must be somé other way.' He said, 'That is the same old story with this ranch. We just have grief and trouble with it. We get half way through a deal and something blows up and goes wrong. We can't do anything unless we get some money.' He said, 'Can't you pay us some money? Can't you pay us five thousand dollars on it. We want some money on the thing.' I said, 'I need what money I have to carry me along in my business and so on.' I again insisted, 'Isn't there some way that we can handle this thing without you foreclosing on it? I want to keep the ranch.' Finally after some words back and forth Mr. Kennedy said, 'The only way I can see for you to do it is to deed us the property and let us take the title to the property so that we

can write off this amount of money and this discount on it.'
I said, 'If you do that will I still get it for the 55,000 dollars?' He said, 'No, we should have 60,000 dollars.' I said,
'Well, if you do that, you ought to reduce the interest from
six per cent to five per cent.' As I understood all along it
had been six per cent. That was agreeable to Mr. Kennedy
and we discussed back and forth how it could be done. I
didn't want to see it that way, but he said, 'That is the only
way we can do it. It has been grief and trouble and the bank
examiners say ''You have got to get it off the books as a loan
or foreclose on it or do something about it.'' On the one hand
we can't give you title to the property and give you back
a mortgage on it and write off the loss we are going to take
on it right there. We have got to put it into the real estate
department. That is the way we have got to do it. Then we
can write off the loss in the real estate department or get a
new deal later on and get this refinancing over with and we
will have a chance to look at your property in Paradise.' In
the conversation I tried to get him to take property in Paradise which we have to reduce the indebtedness down. He
said, 'I can't do that. I don't know what the value of it is.'
He asked me a lot of questions about it. He said, 'Well, if
you want to do it this way now, and deed us the property and
you take a lease and an option back on it for a year, we will
have time to send somebody back up and look at the property
and get an appraisal on it and maybe we can take it in that
way. If we can't take it in that way, maybe we can take it
in as additional security.' I said, 'I don't want to trade it
in as additional security. One big ranch is enough to look
after. That is one of the reasons I want to trade it. I want
to get rid of the worry and trouble of that property.' ''

.   .   .   .   .   .   .   .   .   .   .

''MR. CARTER: Q. Just . . . give the substance of what was
said.

''A. Mr. Kennedy finally said, 'We will do that. We will
take the deed to the property and give you a lease and an
option back on it and that will give us time to inspect the
Paradise property and we can carry the deal on that way
until we can get these things done, get the property inspected
and see if we can take it in.' I said, 'If that falls down is
there some other way that we can do it?' I said, 'I know you
generally sell properties for a small down payment and if

you could get some money on the ranch, like you just said a while ago, what could we do about that? If this falls down we can't do it.' He said, 'We have had nothing but grief and trouble with that thing and we want to get it off of our books.' I said, 'If these things don't go through, can I pay you a payment of five thousand dollars at the end of the time or during the time and carry the balance of the loan and make my payment?' He said, 'We want to settle it and we will settle it in any kind of a deal at all and if you can give us some money that is what we asked you both all along, for some money.' The discussion went on. Mr. Kennedy said, 'We don't know you so well. What security can you give us for this *interest* and taxes so we will know they are being paid? All we have been getting is promises on this place for years.' I said, 'I am making a lease on the grain land on the bottom for forty-five hundred dollars with Herschell Giles at that time.' That is as far as they had gone. 'I am glad to assign that to you to pay the *interest* and the taxes.' He said, 'You haven't got it yet. You can't assign something you haven't got.' We talked back and forth about that. He said, 'What about the equipment and so on that you own? Will you give us a chattel mortgage on that to secure the payment of the *interest* and taxes until you do get the Giles lease?' I said, 'Sure I will.' It was left that way.''

. . . . . . . . . . . .

''A. I said, 'Is it possible that these negotiations or this prospective deal to reduce the mortgage down with the Paradise property, if that isn't acceptable to the bank, can I make some new arrangement or some arrangement now to make a payment on the indebtedness and then continue with a new mortgage.' And he said, 'Yes, all we want to do is to get some money out of that property. All we have ever had is promises.' And I tried to pin Mr. Kennedy down to if he would take five thousand dollars and in an off-hand way he said, 'Yes, some way. We want to make some kind of a deal. We want to get some money out of it. *We want to know finally that it will be paid off. We don't want it.* That is the only piece of property we have in that country. It is no good to us there. We have just had a lot of trouble with it.' That was the gist of the conversation, was the difficulty that had been had with the property in regard to financing.

''Q. Have you given us the substance of the conversation that took place that day?

"A. After the last end of the conversation, why, I said, 'Well, now, how will we handle these papers to get this done?' And Mr. Kennedy said, 'I can't draw them up here in five minutes. It takes time. We are busy. If you will bring us in the list of the chattels on the property up there, personal property, so that we can make out this chattel mortgage, I will draw the papers or have them drawn and send them up to you.' We both agreed then. I asked them what they were and it was to be a *deed* and *a bill of sale, or a chattel mortgage rather,* and the *lease and the option.*"

## Cross Examination

"Mr. Plant [defendant's attorney]: Q. Now when you had that conversation down there at the bank on September 22, 1937, didn't you ask Mr. Kennedy if they couldn't just let the matter stay in abeyance and you give them a new mortgage?

"A. Yes. I asked him if he could carry the property on a new mortgage and reduce the amount down to fifty-five thousand.

"Q. And didn't he say, 'We can't do that. We can't do that because we can't just write off fourteen thousand and some odd hundred dollars, write off one mortgage and take a new one like that'?

"A. Yes. *They couldn't do that on account of bank examiners or some ruling of the bank* or some principle of the bank that they didn't want to do it.

"Q. He told you that they couldn't write off some fourteen thousand dollars and take a new mortgage?

"A. *No, couldn't take a new mortgage for 55,000.*

"Q. I didn't ask you that. Didn't Mr. Kennedy say that they couldn't write off fourteen thousand and some odd hundred dollars, write off one mortgage and then take another mortgage?

"A. Well, those may have been the words, yes, as I remember. That was the substance of the conversation.

"Q. Yes.

"A. *One portion of it, but that isn't all of it, of course.*

"Q. Didn't Mr. Kennedy at that time advise you they had had too much trouble with that ranch already with foreclosures and so forth?

"A. Yes.

"Q. And what he would have to do is take a deed and clear the whole thing up?

"A. Well, he told me, after the course of a lot of conversation, he said *that was the only way he would refinance it for me, was to take a deed.*

"Q. That is the only thing he would do, was to take a deed to the property and clear the whole thing up?

"A. Well, I see you are reading from my deposition, yes. I probably said those words and that was probably the intent of the conversation, was to clear the thing up and give it a new lien on life.

"Q. And they would give you back a lease and an option?

"A. Yes, that was the final conversation.

"Q. That is what he said, was it not?

"A. Yes.

"Q. Now at that time was there any discussion as to whether or not the Weiss indebtedness, that is the 74,000 dollar indebtedness, would be satisfied or cancelled?

"A. Well, there might have been some little discussion but it didn't impress me very much at all as I can remember. There might have been some.

"Q. Wasn't the substance of that discussion this, that when you gave them the deed to the property they would cancel, that is, wipe out, the indebtedness that Mr. Weiss owed them?

"A. That was my impression. It would be, naturally. When they took it, they would have to wipe that out in order to give me a new mortgage. That probably was said, yes.

"Q. *So that you understood that that indebtedness was to be cancelled?*

"A. *Oh, I didn't—— nothing was promised me to that effect at all that I can recall.*

"Q. But that was the substance of the discussion?

"A. I suppose that was some of the substance of the discussion.

.    .    .    .    .    .    .    .    .    .    .    .

"MR. PLANT [Reading from plaintiff's deposition portions of testimony relative to the disposition of the Weiss indebtedness]:

"'A. [by Mr. Beeler] Well, before that I was in the bank there at one time, I don't recall what time it was. We were discussing about that fifty-three acres in the bottom land which was clear and they pulled out their folder there. I saw

them. It was either Jerry Kennedy or it was right there by him and they showed me where they had a deed all ready for Mr. Weiss to sign to the ranch and to the fifty-three acres besides, which was supposed to be free and clear or was free and clear, so far as I was concerned.

" 'Q. [by Mr. Plant] Did he tell you what that deed was going to be for?

" 'A. They were going to take it from Henry Weiss in lieu of his indebtedness. That was before I made a deal with Henry Weiss.

" 'Q. That was in satisfaction of his indebtedness?

" 'A. That's what Henry Weiss was going to do.'

"Now is that statement correct?

"A. That was my understanding, Mr. Plant, for them taking the deed. There wasn't anything said that they were to cancel the indebtedness and they didn't go into that at all but they just said, 'We have the deeds prepared for Henry Weiss to sign here,' and they did show me the deeds.

"Q. Was the statement I have just read you correct?

"A. Yes, that I saw the deeds in there and that they would take the deeds for the property from Henry Weiss.

"Q. They were going to take that deed in lieu of the indebtedness.

"A. I said that voluntarily, Mr. Plant, that I assumed that is what they were doing it for and I still assume that is why they would take the deed. They didn't tell me that is what they would do it for.

"Q. You knew that their taking a deed from you would have the same effect, is that correct?

"A. No. Why should I pay five thousand dollars for a deed a couple of months before and then just give it away for nothing? [Beeler had given Weiss a $5,000 promissory note and assumed Weiss' obligation in return for the deed from Weiss.]

"Q. Isn't it a fact that you knew when they took the deed from you they were going to cancel your indebtedness?

"A. No. I didn't know that.

"Q. Well, I will call your attention again to your deposition . . . I will ask you if these questions were asked you and these answers given?

" 'Q. Now, was anything said about the disposition to be made of Mr. Weiss' notes during that conversation?

" 'A. Well, it was to be that when I gave them the deed to the property, why, then they would cancel—— well, that was automatically wiped out, the indebtedness that Mr. Weiss owed them. That was about all the discussion there was about that.'

"Was that your testimony at the taking of your deposition?

"A. Yes, that was my testimony, because *I was assuming the indebtedness.*"

In summarization of the foregoing testimony, it may fairly be said that it shows that incident to the plaintiff's purchase of the ranch on July 28, 1937, and his assumption of his grantor's obligation to discharge the existing debt thereon, he had been attempting for some months to work out some feasible plan with the bank for a reduction of the loan; that the financial backing on which he relied to meet the terms of the bank's $55,000 cash discount proposition of June, 1937, did not materialize within the time scheduled; that in response to the bank's notice of default and election to sell under its deed of trust, served upon him on September 1, 1937, he visited the bank on September 22, 1937, to "make some other arrangement than the present arrangement of paying the indebtedness off in 55,000 dollars cash"; that he discussed his problem of carrying the loan and continuing with the ranch, with several officers of the bank, but principally with Mr. Kennedy, the vice-president in the real estate loan department, who offered as the only alternative to immediate foreclosure a refinancing scheme whereby the bank "could write off the loan on the books" by taking a deed of the property and giving plaintiff a one-year lease with the option to purchase the ranch at any time during that period; that plaintiff did not want the transaction handled that way, but the bank's officers insisted on this form of procedure as plaintiff's only recourse; that the indebtedness was thereupon fixed at $60,000 instead of the previous discount figure of $55,000 because of the time extension commensurate with the option provision, and the rental was set at an amount equivalent to 5 per cent interest per annum on the aforesaid $60,000, or $3,000, payable semi-annually; that as security for his payment of said interest and the taxes on the property for the ensuing year, plaintiff agreed to give the bank a chattel mortgage on certain equipment on the ranch, with the understanding that such mortgage would be returned

to him upon his assigning to the bank a lease which he was then negotiating with respect to a portion of the ranch property; that plaintiff had a tract of land in Paradise, California, which he wanted the bank to consider as a basis for a reduction of the indebtedness in question; that Mr. Kennedy agreed to have an appraisal of the Paradise property made some time during the course of the year and according to the valuation so established, the bank would "take it in" either "to reduce the debt" or "as *additional* security."

Corroborative of the plaintiff's recital of the parties' negotiations as concerned only with the effectuation of some new security arrangement which the plaintiff could handle successfully is the testimony of a Mr. Brown, plaintiff's banker, who was present during most of the conference on September 22, 1937. This witness, when asked to give his recollection of what occurred at the meeting, testified as follows: "Well, it appeared that Mr. Beeler had acquired a piece of property on which the American Trust Company held a deed of trust. The American Trust Company had filed notice of breach and Mr. Beeler was there for the purpose of endeavoring to refinance it, get an extension or something of that sort, and all the time I was there it centered around this deed of trust."

A few days following this meeting between the parties, the bank forwarded to plaintiff for his execution a deed of conveyance, a bill of sale of certain personal property on the ranch in lieu of the chattel mortgage theretofore specified, and a lease and option agreement—all documents which the parties had discussed in their previous negotiations, and which the plaintiff admittedly signed without question. However, with these papers the bank also sent to the plaintiff for signature an affidavit certifying, according to the pertinent provisions thereof above quoted, the nature of the transaction as an absolute conveyance of title to property in complete satisfaction and cancellation of an existing indebtedness thereon. Nothing had previously been said by any of the bank officials indicating that the bank would ask for, or would require any such affidavit. The plaintiff testified that before signing this affidavit he telephoned to the bank and discussed the document with Mr. McIntyre, an assistant vice-president, who had prepared the necessary papers for the closing of the transaction, as follows: "I asked him what the meaning of the affidavit was, that there was nothing said

about it before. He said, 'We have to have that to clear up the title, so it is all right and we can put it in the real estate department. The bank always takes those.' I didn't think anything about it. I said, 'If you have to have it, that is O.K. I will sign it.' So I did.'' At the trial upon both direct and cross-examination with respect to this matter, Mr. McIntyre admitted that he told the plaintiff at the time in question that the affidavit was needed to satisfy a requirement of the title company before it would issue a title policy upon, the property free of exceptions and that the bank was acting only as ''an intermediary in the matter.'' On its face the affidavit in part sustains this statement as to its purpose, for it expressly provides: ''This affidavit is made . . . particularly for the benefit of the TITLE INSURANCE AND GUARANTY COMPANY, which is about to insure the title to said property in reliance thereon.''

Also bearing on this matter is the following testimony of the plaintiff as to a conversation he had with Mr. McGlynn, an officer of the title company, before the transaction was finally closed: ''We discussed, I told him rather, that this land was clear and so on, that I was deeding it all to the bank to refinance the loan, the way they wanted to do it. He said, 'You have given this affidavit. That takes you out, doesn't it?' I said, 'Why, no, I have a lease and an option and it is a form of refinancing.' He asked, 'What about this revenue stamp on the deed, where you are giving them the deed to the property?' I said, 'There is no need of any revenue stamp on it at all, because it is just given to refinance the thing.' He said, 'You refuse to put the revenue stamp on?' I said, 'Certainly I do.' He said, 'I will have to take that up with the bank.' He said, 'You have your lease and option. I don't want to see them.' I said, 'Why?' He said, 'We can't write a policy of title insurance if you aren't moving off the place and giving possession and turning that place over to them, if you aren't selling it to them.' I said, 'I am not selling it to them.' He said, 'Then I will have to write to our attorneys in San Francisco and advise them to make an exception to the property.' I said, 'Well, that is the story. I am not moving off the property.' He said, 'Are they paying you any money for it?' I said, 'Absolutely not a cent. They don't have to because I am just doing it to refinance.' '' Consistent with the tenor of this conversation

the title company thereafter issued its policy expressly excepting "any rights of C. W. Beeler, who is in possession"—significantly without reference to his occupancy of the property as a lessee—and the bank accepted the policy in this form, although it had previously indicated it wanted the title certificate free of such exception.

Other matters of some relevancy in considering the status of the parties as the result of their consummation of the presently disputed transaction appear from the record: While the testimony relative to the value of the property is in direct conflict, the estimate of the plaintiff and his witnesses supports the trial court's finding that the ranch was worth "in excess of $135,000." ■ This accredited evidence indicating the extent of the inequality between the worth of the property and the consideration stated in the conveyance, to wit, $60,000, the amount claimed by the bank to accord with its appraisal figure, is a "strong circumstance" tending to show that the deed was intended to operate as a mortgage. (*Husheon* v. *Husheon,* 71 Cal. 407 [12 P. 410]; *Emery* v. *Lowe,* 140 Cal. 379 [73 P. 981]; *Lockhart* v. *J. H. McDougall Co.,* 190 Cal. 308 [212 P. 1]; *Reynolds* v. *Hook,* 109 Cal.App. 226 [292 P. 1000]; see, also, annotation in 90 A.L.R. 953-963; 17 Cal.Jur. 788, § 88.) ■ Moreover, the yearly rental value of the property stands uncontroverted in the record as "in excess of $7,500" and the trial court so found, yet under the terms of the plaintiff's lease with the bank the sum denominated rental for the premises was but $3,000 per year—a disparity of some significance, particularly in view of the further evidence that such sum was fixed by the bank at an amount equivalent to the interest rate of 5 per cent per annum on the indebtedness at the reduced figure of $60,000 and payable semi-annually. This, too, constitutes a "strong circumstance" tending to show that the "rent" under the lease agreement was in reality an interest payment consistent with the character of the transaction as a loan. (*Couts* v. *Winston,* 153 Cal. 686 [96 P. 357]; 17 Cal.Jur. 786, § 86.) ■ Still another matter to be here noted is the fact that after the recordation of the deed from the plaintiff, the instrument purportedly given in extinguishment of the existing indebtedness, the bank continued to retain in its possession the two promissory notes—one for $60,000 and the other for $14,400—evidencing the debt se-

cured by the aforementioned trust deed made by the plaintiff's grantor and expressly assumed by the plaintiff in the terms of his purchase of the property. While it appears that following said recordation the bank made certain entries and transfers on its records designed to indicate full payment of the debt, endorsed on the back of the $60,000 note ''We have acquired title by deed. Note cancelled'' and ''wrote off'' the $14,400 note as a loss, such bookkeeping procedure of itself is no more effectual to establish the discharge of the debt than would be the act of the payee in writing the word ''Paid'' across the face of the note, without relinquishment thereof to the maker. There being no delivery of the notes either to Mr. Weiss, the plaintiff's grantor, or to the plaintiff himself, the mentioned notations of the bank in this regard have no force or effect here. (*Wittman* v. *Pickens,* 33 Colo. 484 [81 P. 299]; *Hanna* v. *McCrory,* 19 N.M. 183 [141 P. 996]; *First State Bank of Hilger* v. *Lang,* 55 Mont. 146 [174 P. 597, 9 A.L.R. 1139].)

As to the parties' conduct subsequent to the financial arrangement in question, the following evidence is pertinent: In December, 1937, a great flood occurred in the Sacramento River, as the result of which many permanent improvements on the property here involved were damaged or destroyed. The plaintiff testified that he communicated the magnitude of his loss to certain officers of the bank, that he asked them for a *loan*—not a contribution—of money to defray the expense of repair and reconstruction, that they declined to give him the financial assistance he requested, and that he expended approximately the sum of $3,000 in making the necessary structural replacements on the ranch. While the terms of the lease required the plaintiff during the term thereof to make ordinary repairs on the property, his undertaking a program of improvements on the scale intimated by the mentioned outlay of expense is a factor substantiating his claim of continued occupancy of the property as owner. The plaintiff further testified that in the course of one of his conversations with the officers of the bank relative to the flood damage, he mentioned that he contemplated selling some 276 walnut trees growing on the ranch; that they agreed with him that the removal of such trees would improve the property and that he should keep the proceeds from such sale; that he consummated the sale for the sum of $1,800, which amount he retained without objection from the bank. This

arrangement as detailed by the plaintiff was not contradicted by the bank, and it, too, reflects the plaintiff's exercise of the rights of an owner in relation to the ranch property. Also to be noted here is the fact that some few months after the negotiations of the parties on September 22, 1937, resulting in the financial plan now in controversy, the plaintiff made two leases of different portions of the property — one for $2,750 and the other for $4,500—the latter, in accordance with the parties' understanding on the date mentioned, being assigned by the plaintiff to the bank in payment of his aforesaid yearly rental charge of $3,000, and the second installment of the 1937-1938 taxes on the ranch. The plaintiff discussed both of these lease propositions with the officers of the bank at the meeting of September 22, 1937, and as ultimately concluded, they both were executed as leases, not as sub-leases, of a tenant in possession of property.

Also to be noted at this point is the plaintiff's testimony relative to a conversation had with a representative of the bank in January, 1938, regarding the appraisal of his Paradise property.

### DIRECT EXAMINATION

"MR. CARTER: Q. State what the conversation was [with Mr. Kennedy].

"A. I asked him, 'What did Mr. Elberg [the bank's appraiser] report on the valuation of the property, and would they still take it in to reduce the amount of money I owed them.' He said, 'The only way we can take it in is as additional security.' I said, 'I don't want to give you any additional security. I want to get rid of the place and pay it in on that property, *the loan that I owe you.*' He said, 'We can't do that but *we will take it in as additional security,*' which I refused to do.

"Q. *As additional security for the——*

"A. *Sixty thousand dollars.*

"Q. Was that subsequent to the 27th day of September, 1937?

"A. Yes, it was in January of 1938."

### CROSS-EXAMINATION

"MR. PLANT: Q. Now when you went down and talked to Mr. Kennedy, as you say, about this Paradise property you

referred to 'the *loan which I owe you* and to my indebtedness to you,' did you?

"A. Again, Mr. Plant, I won't say those were the exact words but *in substance that is about it.*

"Q. *As a matter of fact, neither the word 'loan' or the word 'indebtedness' were ever used, were they?*

"A. *Yes, Mr. Plant, they were used and have been from the beginning,* until they decided they wanted to get it away from me."

While much of the foregoing recital is based upon evidence introduced on behalf of the plaintiff and in some important respects is flatly contradicted by witnesses for the defendant bank—particularly in regard to the purpose of the financial arrangement made by the parties at the conference of September 22, 1937, as a cancellation of the existing indebtedness on the ranch rather than another loan transaction—it must be remembered that all questions of preponderance and conflict of evidence are for the trial court. That court had the right to accept the plaintiff's version of this controversial matter as true, and apparently did so. Thus accepted, it was plainly sufficient to justify the finding that the deed in question was intended as a mortgage to secure the antecedent debt as discounted by the bank in formulating the refinancing plan with the plaintiff. In view of this accredited evidence relative to a continuing, subsisting loan, the following language from the case of *Chapman* v. *Hicks,* 41 Cal.App. 158, 162-163 [182 P. 336] is pertinent: "The test of a mortgage is whether the relation of debtor and creditor continues so that there is a subsisting debt after the conveyance [citing cases]; and where a deed, absolute on its face, is given to secure a debt, it will be held to be a mortgage even though the parties stipulate it shall be an absolute conveyance. ([Citing] *Hodgkins* v. *Wright,* 127 Cal. 688 [60 P. 431]. . . .) The intention of the parties must govern, and it matters not what particular form the transaction may take. If the deed is made for the purpose of securing the payment of a debt, it is a mortgage, 'no matter how strong the language of the deed, or any instrument accompanying it, may be.' ([Citing] *Woods* v. *Jensen,* 130 Cal. 200 [62 P. 473].)"

Nor is a different principle applicable here because the plaintiff executed contemporaneously with his deed an affidavit declaring the transaction to be an absolute conveyance and not intended as a mortgage. While the authorities

in this country are divided with reference to the question whether a deed and an accompanying memorandum of agreement, or option of resale to the grantor, may be shown by parol evidence to be a mortgage where the terms of the memorandum unambiguously negative the existence of an indebtedness (see elaborate annotation of cases on the subject in 111 A.L.R. 448), it is the settled law of this state not to hold such writing a conclusive criterion of the character of the transaction. In *Vance* v. *Anderson*, 113 Cal. 532, 538 [45 P. 816] this court set forth the basic doctrine as follows: "A. deed absolute on its face may be shown, by parol, to be intended as a mortgage. It may be stated, as a general proposition, that in this state, at least, every conveyance of real property made as security for the performance of an obligation is, in equity, a mortgage, irrespective of the form in which it is made. Equity looks beyond the mere form in which the transaction is clothed, and shapes its relief in such way as to carry out the true intent of the parties to the agreement, and to this end all the facts and circumstances of the transaction, the conduct of the parties thereto, and their declarations against their own interests, their relations to one another, and to the subject matter, are subjects for consideration. [Citing cases.]" In thus regarding "*all* the facts and circumstances of the transaction" so as to execute the real intention of the parties, the rule prevents either of the parties to the disputed instrument committing a fraud on the other by claiming it as an absolute conveyance, notwithstanding it was given and accepted as security. "To insist on what was really a mortgage, as a sale, is in equity a fraud *which cannot be successfully practiced under the shelter of any written papers, however precise and complete they may appear to be.*" (Italics added.) *Peninsular Trading & Fishing Company* v. *Pacific Steam Whaling Company*, 123 Cal. 689, 694 [56 P. 604].)

The defendant bank's citation of the early case of *People ex rel. Ford* v. *Irwin* (1861), 18 Cal. 117, in support of its argument that in this jurisdiction parol evidence may not be received to vary or dispute the terms of a written instrument concerning the purpose of executing a deed, is of no avail here. That case involved a deed absolute and a contract to reconvey. One Arnold owed the plaintiff, Ford, the sum of $8,600. Arnold conveyed the real property in question by grant, bargain and sale deed to Ford, who, at the

same time delivered to Arnold a written agreement to reconvey the property, in which it was stipulated: "This shall only be treated as a contract to convey, and not as an acknowledgment that said conveyance from Arnold and wife to myself was intended as a mortgage." The opinion does not refer to any ruling upon the admission or exclusion of parol evidence, but discusses the problem as one of the proper construction of the instruments in the light of the evidence which had been received. Thus, it was held that evidence that the actual consideration for the deed was a pre-existing indebtedness equal in amount to the sum required to be paid upon a reconveyance of the property was sufficient to impress upon the deed the character of a mortgage "unless controlled by the clause referred to in the contract" (that is, the stipulation above quoted); that the object of the clause was to "repel" any and all presumptions which the law would otherwise have indulged in relation to the deed, and that there was "no doubt that the parties could, by a provision for that purpose, exclude all extraneous circumstances" affecting the character of the transaction; that such clause in the contract did not take away or interfere in any respect with the efficacy of the contract, but simply repelled "any presumption from outside facts, giving to it an operation different from that intended by the parties."

To the extent that the discussion in the Ford case would limit the court to the consideration of *only* the deed and the accompanying written instrument, without regard for other evidence in the case, in determining the *real nature* of the disputed transaction, it is inconsistent with the import of the subsequently adopted code provision on the subject and cannot be approved. Section 2924 of the Civil Code from the date of its original enactment in 1872 has provided that every transfer of an interest in property, other than in trust, made only as a security for the performance of another act, is to be deemed a mortgage. In accord with the implication of this statutory pronouncement, it was properly recognized in *Vance* v. *Anderson* (1896), *supra,* that a collateral written agreement declaring that a contemporaneously executed deed should be treated as an absolute conveyance, and not as a mortgage, was not conclusive but only *one* of the facts and circumstances of the transaction worthy of consideration in determining the real intention of the parties. If by a separate writing the parties expressly agree, at the same time

an absolute deed is executed, that it is what it purports to be, that is, an absolute sale, that would be no more than what the deed itself says. Therefore, if they could thus avoid its real effect as a mortgage, the true nature of such a transaction could never be shown, and the policy of the law never to permit a security to be converted by *any* contemporaneous agreement into a sale could be constantly evaded. (Civ. Code, §§ 2924, 2925; *Pierce* v. *Robinson,* 13 Cal. 116; *Wehle* v. *Price,* 202 Cal. 394 [260 P. 878]; *Carlson* v. *Robinson,* 7 Cal.2d 235 [60 P.2d 426].) The right of a mortgagee to become the purchaser of the equity is unquestioned, but the relations of the parties are such that the transaction will be carefully scrutinized to prevent the effectuation of some device whereby the debtor under the force of necessitous circumstances is deprived of his right of redemption. (Civ. Code, § 2889; *Russell* v. *Southard,* 12 How. (U.S.) 139 [13 L.Ed. 927]; *Peugh* v. *Davis,* 96 U.S. 332 [24 L.Ed. 775]; *Bradbury* v. *Davenport,* 114 Cal. 593 [46 P. 1062, 55 Am.St. Rep. 92]; Jones on Mortgages, §§ 251, 1045.) The rule in such a case is said to be substantially the same as that prevailing when the deed of a beneficiary to his trustee is questioned. (*Villa* v. *Rodriguez,* 12 Wall. (U.S.) 323 [20 L.Ed. 406]; *Bradbury* v. *Davenport, supra.*)

A situation presenting considerations strikingly akin to those here involved was recently before the appellate court in the second decision in *Davis* v. *Stewart,* 53 Cal.App.2d 439 [127 P.2d 1014] and adjudicated in accordance with the views hereinabove expressed. There, as here, a deed absolute on its face was claimed to be only a mortgage. As a part of the transaction in which the deed was given, the grantor and grantee entered into an elaborate written agreement, which among other things provided: "It is understood and agreed that first party shall become, upon execution and delivery of said deed the absolute owner of said property, together with all improvements thereon and that this transaction does not constitute a mortgage, subject only however to said option for said five-year period." (See recital in *Davis* v. *Stewart,* 31 Cal.App.2d 574, 576 [88 P.2d 734].) Over objection, the trial court admitted oral testimony to the effect that notwithstanding the declarations of the contemporaneous writing, the deed was in fact intended as security for the payment of a debt. Thereafter findings were made in accord-

ance with the oral evidence, and the judgment establishing the deed as a mortgage was affirmed. The defendant bank argues that the situation in the Davis case is distinguishable because the written agreement there did not expressly provide, as does the affidavit here, that the deed "was not and is not now intended . . . as security of any kind . . ." and hence evidence extrinsic to the writing was properly received to remove the uncertainty as to whether or not the disputed instrument was given in satisfaction of the antecedent indebtedness. That is but a tenuous distinction and will not bear close scrutiny. In both cases the import of the contemporaneous writing is the same—the negation of a security arrangement incident to the subsistence of the debt—and whether one writing amplifies by detailed recitals the purported purpose of the parties to execute an absolute transfer of title to the property involved is an immaterial consideration. Certainly, in neither instance is the language of the accompanying instrument so obscure as to require extrinsic evidence for its explanation or understanding. And, in one case as in the other, the declaration of the writing would not be held controlling unless it should appear upon *complete* evidence that it was in harmony with "*all* the facts and circumstances of the transaction." (*Vance* v. *Anderson, supra.*)

In concluding the discussion of this phase of the present appeal, it is sufficient to state that the circumstances of the whole case, as reflected by the evidence accredited in the trial court, are entirely consistent with the view that the defendant bank, while in fact agreeing on a loan to be secured by mortgage, was desirous, for reasons of certain interdepartmental requirements connected with its routine bookkeeping procedure, of giving the transaction a different appearance by recording it as an absolute transfer of title. Such cases cited by the defendant bank as *Henley* v. *Hotaling,* 41 Cal. 22; *Farmer* v. *Grose,* 42 Cal. 169; *Woods* v. *Jensen,* 130 Cal. 200 [62 P. 473]; *Wehle* v. *Price,* 202 Cal. 394 [260 P. 878]; and *Goodfellow* v. *Goodfellow,* 219 Cal. 548 [27 P.2d 898], wherein an absolute deed was sustained as such in the face of the claim that it was intended by the parties as a mortgage, merely rest upon an affirmance of the trial court's judgment as based upon substantial evidence and thus do not conflict with the fundamental premise of this opinion as to an appellate court's function in reviewing the record to determine whether challenged findings lack evidentiary support.

There is no force here to the contention of the defendant bank that there was no consideration for the agreement for the reduction of the indebtedness as claimed by the plaintiff to have been made between the parties at the basic conference of September 22, 1937, as aforesaid. In the first place, the record discloses that the trial court found on substantial evidence that at said meeting the parties concluded with respect to various phases of the contemplated financial arrangement a number of reciprocal agreements, of which *one* concerned the understanding as to the discount of the existing debt; that as the result of these integrated negotiations the deed in question was executed and the parties have acted thereunder, though in dispute as to the real purpose of the conveyance. But regardless of this observation, the record further shows that this matter of lack of consideration was not pleaded in the trial court, that the cause was tried on other issues entirely and as if such point did not enter into the case; consequently, such objection may not properly be raised for the first time on appeal. (2 Cal.Jur. 234-235, § 67; *Los Angeles Inv. Co.* v. *Home Sav. Bank,* 180 Cal. 601 [182 P. 293, 5 A.L.R. 1193].)

Two additional questions presented by the record require some discussion. The first of these relates to the payment of taxes on the property involved. As above stated, the lease agreement expressly placed this obligation upon the plaintiff during the one-year period therein specified—October 1, 1937, to September 30, 1938. With regard to the first installment of the 1937-1938 taxes, the record discloses that the plaintiff on November 30, 1937, received from the bank a letter enclosing the bill for the taxes covering the real property and stating that the bill covering a separate assessment with respect to certain personal property on the ranch had been forwarded to the plaintiff's grantor, Mr. Weiss, who was responsible therefor; that on December 3, 1937, the plaintiff gave the tax collector his check for the amount of the real property taxes; that subsequently the tax collector notified the bank as to the receipt of the plaintiff's check, but stated that such segregable amount of the entire tax bill could not be accepted until payment of the personal property assessment was made; that the bank suggested to the plaintiff by letter that he pay the balance of the tax bill and deduct that amount from a certain sum he then owed to Mr. Weiss in

connection with the purchase of the ranch; that the plaintiff did nothing further in the matter and on April 25, 1938, his check for the real property taxes was returned to him by the tax collector; that the bank on May 16, 1938, served on the plaintiff a notice to quit the premises for breach of his lease, and subsequently commenced unlawful detainer proceedings. The plaintiff testified that in June, 1938, he called at the defendant bank and offered to pay the delinquent taxes, including those on the personal property in question, if the bank would not prosecute the eviction proceedings; that he then had sufficient money in his bank account to substantiate his offer of payment; and that the officers of the defendant bank refused to accept his proposition. As previously noted, the unlawful detainer action resulted in a judgment in favor of the plaintiff herein because of the defect in the notice of breach with respect to the amount of his tax liability. In view of this evidence the trial court properly concluded that the defendant bank should be reimbursed to the extent of its payment of the first installment of the real property taxes, $477.88, but that the running of interest on such sum was stopped by virtue of the plaintiff's offer of payment made in good faith and with ability to perform. (Civ. Code, § 1485.)

As to the second installment of the 1937-1938 taxes, there arises the question of the effect of the plaintiff's assignment of a certain lease to the bank in discharge of this obligation. The plaintiff testified that at the aforesaid conference of September 22, 1937, he agreed to assign to the bank "to pay the interest [rent] and the taxes" a lease he was then negotiating with respect to a portion of the ranch; that such assignment was accordingly made "to pay up all of the three thousand dollars and the second half of the taxes in full"; that following the bank's acceptance of the assignment he was given a "receipt for all the payments, the interest payments" that he owed it. While certain witnesses for the defendant bank stated at the trial that the assignment was taken only as security for the amount of the rental charge and the specified tax installment, the instrument itself purports to be absolute on its face and apparently the court so construed it in accordance with the plaintiff's positive testimony in the matter. Accordingly, the trial court's finding to the effect that the assignment was in full payment of the aforesaid second installment of taxes, as well as for the

rental charge of $3,000 under the terms of the lease agreement, is binding on this appeal, and the defendant bank's claim that the plaintiff is indebted to it in the amount of said tax installment cannot be sustained.

However, the record further establishes, and the plaintiff so concedes, that pending the trial of this action the defendant bank paid the first installment of the 1938-1939 taxes amounting to $430 on the real property here involved. Apparently the trial court inadvertently failed to make any finding as to this matter. Since there is no question as to the validity of the bank's claim for reimbursement for this expenditure, we are authorized under section 956a of the Code of Civil Procedure to supply the missing finding. We, therefore, find ''That the defendant, American Trust Company, paid the first installment of the 1938-1939 taxes on said real property, amounting to the sum of $430, and that pursuant to the agreement of the parties, it was the duty of the plaintiff to pay said first installment, and said defendant should be reimbursed for its payment thereof; that there is now due and owing from the plaintiff to the defendant, American Trust Company, the sum of $430, but without interest thereon because of said defendant's refusal of the offer of payment hereinafter in these findings referred to.'' (Finding to be numbered XXVIIIa.)

The defendant, having paid the sum of $430 on account of the taxes due for the year 1938-1939, as well as the sum of $477.88 on account of the taxes for the previous year, is entitled to be reimbursed in the aggregate amount of $907.88.

For the purpose of making the findings harmonize, it is further necessary to modify Finding XXXIV by striking out subdivision 2 thereof and inserting in its place the following:

''2. The sum of $907.88, being the amount of taxes on said real property for the years 1937-1938 and 1938-1939 paid by the said defendant, American Trust Company, together with legal interest upon said amount from the date of entry of the decree in this action.''

The conclusions of law are also modified so as to meet these changes in the findings of fact.

The second and final point presented for determination relates to the proper allowance of interest to be made to the defendant bank with reference to the adjudicated mortgage indebtedness of $60,000. It is claimed by the plaintiff and

found by the trial court that a tender of this amount was made to the defendant bank some few months before due under the parties' agreement and that because of such tender and refusal thereof, the bank is not entitled to interest from that date. (Civ. Code, § 1504.) The defendant bank contends that the tender, if in fact made, was insufficient to stop the running of interest.

The finding of the trial court upon the matter of tender is substantially as follows: That on June 20, 1938, at the defendant bank the plaintiff offered to pay his indebtedness in good faith, and was ready, willing and able to do so; that prior to that date plaintiff had entered into an arrangement with one MacArthur whereby the latter had agreed to advance to plaintiff the amount of money necessary to pay the indebtedness; that said MacArthur was financially able to make the requisite advancement, and was ready and willing to do so; that this offer was made to Mr. Kennedy, vice-president of the bank; that said Kennedy refused that offer without specifying any objection to its form, and refused to deal with the plaintiff in the matter in any way, but demanded that the plaintiff vacate the property within thirty days; that by virtue of its said officer's actions the defendant bank waived objection to the mode of the offer and waived tender or other offer; that such offer of performance suspended the running of interest upon the indebtedness.

This finding is in strict accord with the plaintiff's evidence on the subject. In regard to his interview with Mr. Kennedy on the day mentioned, the plaintiff testified as follows: ''Well, I went into the bank. He [Kennedy] was sitting at his desk. . . . He apparently—well, he was sore because I came in. He told me before he didn't want to deal with me. I said, 'I will come in. I have a man by the name of Roderick MacArthur that will give me enough money that I can liquidate this indebtedness and I want to talk to you about it and see what we can do to get it closed up.' He said, 'I don't want to talk to you. You get out of this bank. We have had nothing but trouble with you and all these leases and everything and I don't want to talk to you at all. We want you to get off of that ranch and if you are not off in thirty days we will put you off.' I tried to talk further. I tried to say something, and he walked off and said, 'I don't want to talk to you. You get out of here.' '' Mr. MacArthur corroborated the plaintiff's statement with respect to their

prior arrangement for the necessary advance of money, and added that he was financially able to discharge the indebtedness at the time he so agreed to assist the plaintiff. While Mr. Kennedy on behalf of the bank gave an entirely different account of the conversation had with the plaintiff on the day in question, the trial court in its findings expressly denied credence to the substance of his testimony. Since, as aforestated, the credibility of witnesses is a matter wholly within the province of the trial court, its discretion as here exercised will not be disturbed on appeal.

The evidence accredited by the trial court supports not only its finding as to the fact of the offer of payment, but also its sufficiency to prevent the running of interest on the plaintiff's obligation. Thus, it appears that Mr. Kennedy as representative of the defendant bank declined absolutely to negotiate with the plaintiff in the matter and, without making any objection as to the form of the tender or questioning the plaintiff's ability to perform his offer, he simply refused to consider the proposition that the plaintiff had the right to protect his interest in the property involved. Upon this basis the trial court was warranted in concluding that any further action by the plaintiff in this respect would have met with like rebuff by the bank, and that a valid offer having once been made and refused, the indebtedness ceased to bear interest as of that date. (Civ. Code, §§ 1496, 1501, 1504; *Lockhart* v. *J. H. McDougall Co.*, 190 Cal. 308 [212 P. 1].)

In accordance with the views above expressed, the judgment is modified by striking therefrom the figures $477.88, and inserting in their place the figures $907.88, and as so modified, the judgment is affirmed. Neither party to recover costs on appeal.

Gibson, C. J., Shenk, J., Schauer, J., and Spence, J. pro tem., concurred.

TRAYNOR, J., Dissenting.—The evidence in this case is insufficient, in my opinion, to uphold the trial court's finding that defendant, with a deed of trust on real property worth over $135,000 securing an indebtedness of $81,232.90, entered into an agreement to reduce the indebtedness to $60,000 and to accept an inarticulated mortgage in place of its deed of trust.

Since a mortgage secures an obligation it cannot be proved that a conveyance is intended as a mortgage if there is no liability "independent of the conveyance and contract of conveyance, which the grantee can enforce against the grantor." (4 Pomeroy, Equity Jurisprudence, [Symons' fifth ed., 1941] § 1195, p. 579; *Holmes* v. *Warren,* 145 Cal. 457 [78 P. 954]; *Chapman* v. *Hicks,* 41 Cal.App. 158 [182 P. 336]; see 17 Cal.Jur. 783.) The only debt in the present case was that represented by Weiss's promissory notes, and no relation was established between these notes and the deed, option, and lease. The amount payable by plaintiff to exercise the option was different from the amount due on the notes, and the rent payable until the exercise of the option was different from the interest prescribed by the notes. The only evidence regarding the notes in the disputed transaction shows that they were to be cancelled when plaintiff executed his deed to defendant. Both defendant's officers and plaintiff testified to that effect. When plaintiff's deposition was taken before the trial, plaintiff was asked, "Now, was anything said about the disposition to be made of Mr. Weiss's notes during that conversation?" and answered, "Well, it was to be that when I gave them the deed to the property, why, then they would cancel—well, that was automatically wiped out, the indebtedness that Mr. Weiss owed them." Plaintiff also testified, "As far as the notes, I know when they took a deed to the property and reconveyed it that these notes and the mortgage would be wiped out, if the deed was standing in the bank's name."

Plaintiff testified unequivocally on that occasion that the notes were to be cancelled. His later testimony was inconsistent. At times he did not recall clearly what, if anything, was said about the notes. When asked whether there was a discussion as to the satisfaction or cancellation of the notes, he replied, "Well, there might have been some little discussion but it didn't impress me very much at all that I can remember. There might have been some." At times he adhered to his earlier testimony that the notes were to be cancelled or satisfied. He was asked, "Wasn't the substance of that discussion this, that when you gave them the deed to the property they would cancel, that is, wipe out, the indebtedness that Mr. Weiss owed them?" He replied, "That was my impression. It would be, naturally. When they took it,

they would have to wipe that out in order to give me a new mortgage. That was probably said, yes." He was also asked, "They were going to take that deed in lieu of the indebtedness?" and answered, "I said that voluntarily, Mr. Plant, that I assumed that is what they were doing it for and I still assume that is why they would take the deed." Yet, when asked, "Isn't it a fact that you knew when they took the deed from you they were going to cancel your indebtedness?" plaintiff replied, "No, I didn't know that."

Plaintiff, in taking the position that the notes were to be cancelled but that somehow the debt was not, appears to have been influenced by the belief that some obligation against him existed apart from the notes. When confronted with his earlier testimony, he did not repudiate it but said, "Yes that was my testimony, because I was assuming the indebtedness." Plaintiff's brief suggests that the assumption agreement with Weiss created "an independent contract obligation that was to continue," and that "the Weiss indebtedness was to be satisfied and his own continued."

The only liability plaintiff agreed to assume, however, was the indebtedness represented by Weiss's promissory notes and secured by the deed of trust. There was but one indebtedness, and while plaintiff became primarily liable therefor and Weiss secondarily liable under the assumption agreement, its satisfaction would necessarily end both liabilities. Plaintiff's testimony cannot be construed to suggest that this indebtedness was to be satisfied as to Weiss, but continued as to plaintiff, for in his answer to a suit brought by Weiss he declared that "he did fulfil and carry out the terms of his agreement regarding the payment of said obligation against said property and did procure the same to be released and satisfied in full." What the trial court found, moreover, was not that the deed was taken as security for some independent obligation arising from the assumption agreement but that it was executed pursuant to an agreement that the "trust deed indebtedness and interest" i.e., the Weiss indebtedness, should be reduced and the deed taken as security for the reduced indebtedness. The contention that the Weiss indebtedness was to be satisfied and the deed taken as security does not support the finding but impeaches it. The finding cannot be sustained unless it can be concluded that plaintiff

and defendant's officers understood that the Weiss notes were to continue in effect.

The evidence establishes without contradiction that it was intended that these notes be cancelled. Pursuant to that understanding plaintiff executed the deed to defendant. Defendant marked the large note cancelled and wrote off the smaller note at a loss, insisted upon receiving plaintiff's affidavit that the deed was executed in full satisfaction of the indebtedness, and recorded the reconveyance reciting full satisfaction of the indebtedness. Once these steps were taken the bank was powerless to enforce payment of the notes. The only reason in the majority opinion for holding that the debt survived this operation is that the notes could not be cancelled without delivery to Weiss or to plaintiff. It is settled, however, that the parties to a note can extinguish the obligation thereof by accepting something other than the performance promised. (Civ. Code, §§ 1521, 1522; *Silvers* v. *Grossman,* 183 Cal. 696 [192 P. 534]; *B. & W. Engineering Co.* v. *Beam,* 23 Cal.App. 164 [137 P. 624]; see Brannan's Negotiable Instrument's Law, [Beutel's sixth ed., 1938] § 119 (4), pp. 963, 964.) It has always been clear that the obligation of a note can thus be terminated without delivery. (See cases cited in Brannan, pp. 962, 964, *supra.*) Plaintiff's obligation was terminated when defendant accepted the deed in satisfaction of the notes. The Colorado (*Wittman* v. *Pickens,* 33 Colo. 484 [81 P. 299]), the New Mexico (*Hanna* v. *McCrory,* 19 N.M. 183 [141 P. 996]), and the Montana (*First State Bank of Hilger* v. *Lang,* 55 Mont. 146 [174 P. 597, 9 A.L.R. 1139]), cases, which constitute the sole authority cited for a contrary conclusion, actually establish only that delivery of the notes is essential if the creditor proposes as a gift to free the debtor.

Thus, even if this were an ordinary civil case where only a preponderance of evidence is required, the evidence is insufficient to support the finding that the trust deed indebtedness, i.e., the Weiss indebtedness, should be reduced and the deed taken as security for the reduced indebtedness, and is likewise insufficient to support the contention that Beeler's agreement to assume the Weiss indebtedness created an independent contract obligation or that the cancelled notes remained in effect. This is not an ordinary civil case, however, for, as the majority opinion concedes, it was incumbent upon plaintiff to support his contention by evidence, "clear, satis-

factory and convincing; explicit, unequivocal and indisputable." (*Wehle* v. *Price*, 202 Cal. 394, 397 [260 P. 878]; *Goodfellow* v. *Goodfellow*, 219 Cal. 548, 554 [27 P.2d 898].) While it rests primarily with the trial court to determine whether the evidence is clear and convincing, its finding is not necessarily conclusive, for in cases governed by the rule requiring such evidence "the sufficiency of the evidence to support the finding should be considered by the appellate court in the light of that rule." (*Sheehan* v. *Sullivan*, 126 Cal. 189, 193 [58 P. 543]; see, also *Moultrie* v. *Wright*, 154 Cal. 520 [98 P. 257].) In such cases it is the duty of the appellate court in reviewing the evidence to determine, not whether the trier of facts could reasonably conclude that it is more probable that the fact to be proved exists than that it does not, as in the ordinary civil case where only a preponderance of the evidence is required, but whether the trier of facts could reasonably conclude that it is highly probable that the fact exists. When it holds that the trial court's finding must be governed by the same test with relation to substantial evidence as ordinarily applies in other civil cases, the rule that the evidence must be clear and convincing becomes meaningless. There is a contradiction in thus destroying the vitality of the rule while affirming its soundness. If, as in my opinion, the rule is sound, this court has erred in its pronouncements (see 25 Cal.Jur. 248; 2 Cal.Jur. 921) declining to accept responsibility for its enforcement. (See my dissenting opinion in *Stromerson* v. *Averill*, 22 Cal.2d 808, 817 [141 P.2d 732].)

The doctrine that a deed may be shown to be a mortgage was originally an equitable one. It is also to be recalled that in equity cases the appellate court would review the facts de novo. Although the question whether the evidence establishes that a deed was intended as a mortgage is now decided by the jury in this state (*Locke* v. *Moulton*, 108 Cal. 49 [41 P. 28], see contra, *Reilly* v. *Cullen*, 159 Mo. 322 [60 S.W. 126]) the jury's determination must be supported by clear and convincing evidence. It is doubtful whether the rule that it is a question for the jury whether a deed was intended to be a mortgage would have been adopted without the protection afforded by the rule requiring the evidence to be clear and convincing. Thus, in considering a similar problem with

respect to the reformation of contracts, Judge Cardozo, for the New York Court of Appeals, declared: "Juries may find it difficult to apply the presumption that preliminary treaties are merged in the written contract if they are permitted to consider such treaties as evidence of mistake. Against these and like dangers, there are two methods of relief. One is suggested by the provision of the statute that 'the court in its discretion may order one or more issues to be separately tried. . .' The other is found in a strict enforcement of the rule that reformation must be refused unless the case in support of it is 'of the clearest and most satisfactory character.' . . . Judgments for reformation have been reversed even in this court for failure to obey it." (*Susquehanna S.S. Co.* v. *A. O. Andersen & Co.*, 239 N.Y. 285, 296 [146 N.E. 381].)

So grave is the danger that deeds will be erroneously found to be mortgages that some states have refused to apply the doctrine that a deed may be shown to be a mortgage except upon proof of fraud or mistake (see *Jackson* v. *Maxwell*, 113 Me. 366, 368 [94 A. 116]), while others have held that the doctrine will not be applied unless the grantor's testimony is corroborated by independent testimony. (*Stitt* v. *Rat Portage Lumber Co.*, 96 Minn. 27, 32 [104 N.W. 561].) The solution adopted in this state of requiring clear and convincing evidence requires not simply that the appellate courts go through the form of recognizing the rule, but that, like the appellate courts of many other states, they accept responsibility for its enforcement. (*Susquehanna S.S. Co.* v. *A. O. Andersen & Co.*, 239 N.Y. 285, 296 [146 N.E. 381]; *Allison Bros. Co.* v. *Allison*, 144 N.Y. 21, 33 [38 N.E. 956]; *Nevius* v. *Dunlap*, 33 N.Y. 676, 680; *Baird* v. *Baird*, 48 Colo. 506, 517 [111 P. 79]; *Rasch* v. *Rasch*, 278 Ill. 261, 271 [115 N.E. 871]; *Jackson* v. *Maxwell*, 113 Me. 366, 368 [94 A. 116]; *Frohlich* v. *Aikman*, 194 Mich. 569, 573 [161 N.W. 867]; *Baum* v. *Ward*, 131 Ark. 593 [199 S.W. 529]; *Nicolls* v. *McDonald*, 101 Pa.St. 514; *Pancake* v. *Cauffman*, 114 Pa.St. 113 [7 A. 67]; *Jeffcoat* v. *Wingard*, 110 S.C. 482 [96 S.E. 908]; *Page* v. *Page*, 132 Va. 63 [110 S.E. 370]; *Salas* v. *Olmos*, 47 N.M. 409 [143 P.2d 871, 874].) The United States Supreme Court recently reaffirmed its responsibility for enforcement of the rule in *Schneiderman* v. *United States*, 320 U.S. 118, 124 [63 S.Ct. 1333, 87 L.Ed. 1796], where it declared: "For

though we assume, without deciding, that in the absence of fraud a certificate of naturalization can be set aside under § 15 as 'illegally procured' because of the finding as to attachment [to the principles of the Constitution] would later seem to be erroneous, we are of the opinion that this judgment should be reversed. If a finding of attachment can be so reconsidered in a denaturalization suit, our decisions make it plain that the Government needs more than a bare preponderance of the evidence to prevail. The remedy afforded the Government by the denaturalization statute has been said to be a narrower one than that of direct appeal from the granting of a petition. *Tutun* v. *United States*, 270 U.S. 568, 579 [46 S.Ct. 425, 70 L.Ed. 738]; *cf. United States* v. *Ness*, 245 U.S. 319, 325 [38 S.Ct. 118, 62 L.Ed. 321]. *Johannessen* v. *United States* states that a certificate of citizenship is 'an instrument granting political privileges and open like other public grants to be revoked if and when it shall be found to have been unlawfully or fraudulently procured. It is in this respect closely analogous to a public grant of land . . .' 225 U.S. 227, 238 [32 S.Ct. 613, 56 L.Ed. 1066]. See also *Tutun* v. *United States, supra*. To set aside such a grant the evidence must be 'clear, unequivocal, and convincing'— 'it cannot be done upon a bare preponderance of evidence which leaves the issue in doubt.' *Maxwell Land-Grant Case,* 121 U.S. 325, 381 [7 S.Ct. 1015, 30 L.Ed. 949]; *United States* v. *San Jacinto Tin Co.,* 125 U.S. 273, 300 [8 S.Ct. 850, 31 L.Ed. 747]; *cf. United States* v. *Rovin,* 12 F.2d 942, 944. See Wigmore, Evidence, (3d ed.) § 2498. This is so because rights once conferred should not be lightly revoked. And more especially is this true when the rights are precious and when they are conferred by solemn adjudication, as is the situation when citizenship is granted. The Government's evidence in this case does not measure up to this exacting standard.''

One searches the record in vain for clear and convincing evidence that the deed in this case was intended to be a mortgage. The majority opinion relies largely on plaintiff's testimony. That testimony was impeached, however, because of the interest of the plaintiff, and because it was inconsistent with his sworn affidavit. The story told was, moreover, an incredible one; that purely for bookkeeping purposes the bank entered into an agreement to accept an inarticulated

mortgage in the sum of $60,000 in lieu of a deed of trust on real property worth over $135,000 securing an indebtedness of $81,232.90.

Plaintiff's contention rests upon inferences that he seeks to elicit from evidence relative to the circumstances under which the deed was delivered and to the subsequent conduct of the parties. This evidence does not warrant plaintiff's inferences. It is described in the majority opinion as ''entirely consistent with the view that defendant bank, while in fact agreeing on a loan secured by a mortgage, was desirous, for reasons of certain interdepartmental requirements connected with its routine bookkeeping procedure, of giving the transaction a different appearance by recording it as an absolute transfer of title.'' It is not enough for the evidence merely to be consistent with plaintiff's contention, however, for it is wholly consistent with the agreement set forth in the writings. The burden was on plaintiff to prove that it was highly probable that the deed was not what it purported to be. He did not sustain this burden by evidence that at best is simply consistent with the deed's being something else, but which is just as consistent with its being what it purports to be. (*Goodfellow* v. *Goodfellow, supra; Wehle* v. *Price, supra; Woods* v. *Jensen, supra.*)

Plaintiff infers from the fact that the $3,000 rental specified in the lease was equivalent to 5 per cent of the option price of $60,000, that the rental was actually interest, and the option price actually an indebtedness. Such a rental is bound to be a percentage of the option price and is apt to fall within the normal range of interest returns on investments equivalent to that price. It would be as arbitrary, however, to transmute a rental into an interest charge because it produced the same return as to transmute a dividend from stock into interest from a bond. There is nothing in the mathematical relation between the two figures that gives any clue to what they represent; the substance of the relationship is not found in the sums. It is to the terms of a transaction that one must look, and not to the sums involved, since transactions may differ widely in nature, however alike may be the sums they involve.

Plaintiff contends that Mr. Kennedy, the bank's representative, agreed to have an appraisal made of a tract of land that plaintiff owned in Paradise, California, to guide

the bank in taking it in either "to reduce the debt" or "as additional security," and infers that if the security was "additional" the deed in question was a mortgage. By plaintiff's own testimony, however, the conversations regarding the Paradise property were concerned with the possibility of defendant's taking it as part of the option price. In the negotiations of September 22nd he asked if defendant would take the Paradise property to reduce the indebtedness. Kennedy replied that the bank could not do so, but that if plaintiff gave the bank the deed and took back a lease and option, the latter would examine the property to determine whether it would be acceptable as part payment of the option price or as additional security for a part thereof. This suggestion obviously contemplated the possibility that the parties might later enter into an arrangement enabling plaintiff to exercise his option by paying only part of the price in cash. Following Elberg's visit to the property Kennedy told the plaintiff that the bank could not take it outright, but might take it as additional security. It cannot reasonably be inferred even from plaintiff's own testimony that defendant regarded the indebtedness as subsisting and contemplated the Paradise property as additional security for that indebtedness rather than for the option price.

Plaintiff relies upon the testimony of his banker, Mr. Brown, for support for his contention. Brown merely testified, however, that he was present during the first part of the conversation of September 22nd, but left before its conclusion; that respondent asked for another extension of time; that Kennedy replied that back-interest would have to be paid up "before any discussion of that sort"; that there was some discussion as to whether the deed of trust covered all of the property to which plaintiff had title, and that "just as I left they had sent for the certificate or for the deed of trust." There is nothing in this testimony to suggest that defendant agreed to reduce the indebtedness and accept the deed as security for the lower amount.

The exception in the title policy of "any rights of C. W. Beeler who is in possession" is invoked to uphold the contention that the deed was simply a mortgage. It was defendant's lease and option, however, that necessitated this exception. Before the transaction was closed, defendant was advised by Mr. McGlyn, an officer of the Tehama County

Title Company, that plaintiff's affidavit put an end to his interest in the property. Plaintiff replied that he had an option. McGlyn later advised the Title Insurance and Guarantee Company by telephone that defendant had a lease and option and would remain in possession of the property, and that company thereupon obtained defendant's confirmation of these facts and its consent to the exception in the title policy.

No support for plaintiff's contention can be found in the discussion regarding the sixty-dollar internal revenue stamp. The stamp was already on the deed and the title company had been instructed to bill defendant for its cost so there is no reason why McGlyn should have asked plaintiff whether he refused to put the stamp on. In any event whatever views plaintiff may have expressed to McGlyn about the deed's being merely a means of refinancing, there is no claim that he communicated his views to defendant. (See *Brant* v. *California Dairies, Inc.*, 4 Cal.2d 128 [48 P.2d 13].)

Plaintiff relies heavily upon the finding of the trial court that when the deed in question was executed, the property had a market value of more than $135,000, and a rental value of more than $7,500, figures that substantially exceeded the option price and the rental fixed in the lease. Such an excess in conjunction with other circumstances is often indicative of a security transaction, for the greater the valuation in relation to the indebtedness, the more unlikely the owner is to sell the property to cancel the indebtedness. In this case, however, the parties themselves, whose valuations alone are pertinent (*Tetenman* v. *Epstein*, 66 Cal.App. 745 [226 P. 966]), did not attach so high a value to the property. Even if they had, it is inconceivable that the bank would voluntarily have reduced an indebtedness so amply secured, and relinquished, to its own disadvantage, a deed of trust for such a mortgage. (See *Robinson* v. *Barnard*, 5 Cal.App.2d 396, 400 [42 P.2d 711].)

There is nothing in the evidence of conduct subsequent to the transaction to establish that the deed was taken as security rather than in satisfaction of the indebtedness, or that plaintiff had anything more than a lease and an option. Plaintiff's repair of the fences and removal of the walnut trees following the flood of the Sacramento River in 1937 do not signify that the bank regarded him as the owner of the

property. He was bound by the terms of his lease to repair the fences, and he removed the walnut trees only after obtaining defendant's consent. Even if the improvements were more extensive than the lease required they do not signify ownership, for they would redound to the advantage of the plaintiff if he exercised the option. The evidence of the leases by the plaintiff likewise fails to establish him as the owner of the property, for his lease from the bank permitted him to make subleases, and it was a matter of indifference to the bank whether the instruments executed by the plaintiff and his lessees took the form of leases rather than subleases.

Even assuming that a debt still existed, and that the deed was intended to secure it, there is no evidence that the debt was $60,000 and not $81,232.90, the amount due when the deed was executed. It is contended that it was agreed that the debt should thus be reduced at the conference between plaintiff and the bank officials. Plaintiff, however, testified without contradiction that it was then agreed that the notes be cancelled. Following the conference, the deed, the lease containing the option, and the affidavit were executed as formal memorials of the agreement then made. While parol evidence is admissible to show that a deed is a mortgage, it is not admissible to vary the terms of a written contract so as to transform it from a complete to a partial cancellation. (Cal. Code Civ. Proc., § 1856; see 10 Cal.Jur. 916, 924.) The majority opinion holds that the notes were not discharged, because they were not delivered to Weiss or to plaintiff. Yet the larger note was cancelled, the smaller one was written off as a loss, and satisfaction of both was recorded pursuant to the understanding of plaintiff and defendant. Despite these facts it is held that without delivery of any note, the debt is reduced to $60,000, the amount of the larger note. It is pertinent to inquire how the smaller note is then discharged without delivery.

Moreover, the supposed agreement to release plaintiff from a liability of over $21,000 was clearly without consideration and is unenforceable. (*Scheeline* v. *Moshier*, 172 Cal. 565 [158 P. 222]; see 6 Cal.Jur. 179.) If the deed was given merely as security it represented less than defendant already had. The deed of trust contained the usual power of sale and other provisions for defendant's protection and was not subject to the 1933 amendments restricting the right to judg-

40

ment for a deficiency. (Cal. Civ. Code, § 2924½; Cal. Code Civ. Proc., § 580(a).) Regarded as security, the deed was less advantageous to defendant, less burdensome to plaintiff. It conferred no power of sale and would have to be foreclosed by court proceedings, thereby leaving plaintiff with a right to redeem. It contained no provisions for defendant's protection and was subject to the 1933 amendments. As security, therefore, the deed, far from being of advantage to the defendant, was of advantage to plaintiff. Since the alleged agreement was oral, and it appeared upon the face of the complaint that there was no consideration, a special plea by defendant of lack of consideration was unnecessary. (*Acheson* v. *Western Union Tel. Co.*, 96 Cal. 641 [31 P. 583]; see 2 Cal.Jur. 257.)